264 F.Supp.2d 1064 (2003)
Daniel GREENBERG, Fern Kupfer, Frieda Eisen, David Green, Canavan Foundation, Dor Yeshorim, and National Tay-Sachs and Allied Diseases Association, Inc., Plaintiffs,
v.
MIAMI CHILDREN'S HOSPITAL RSEARCH INSTITUTE, INC., Variety Children's Hospital, Inc. d/b/a Miami Children's Hospital, and Reuben Matalon, Defendants.
No. 02-22244-CIV-MORENO.
United States District Court, S.D. Florida, Miami Division.
May 29, 2003.
*1066 Bruce Rogow, Esq., Beverly Pohl, Esq., Bruce S. Rogow, PA., Ft. Lauderdale, Laurie Ellen Leader, Esq., Edward M. Kraus, Esq., Chicago Kent College of Law Illinois Institute of Technology, Chicago, IL, Counsel for Plaintiff.
Robin Taylor Symons, Esq., Ford & Harrison LLP, Karen L. Stetson, Esq., Broad and Cassel, Miami, Counsel for Defendant.

ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS
MORENO, District Judge.
This case presents an unfortunate legal dilemma set against the backdrop of a historic breakthrough in the treatment of a previously intractable genetic disorder. Both parties in this case were jointly engaged in a noble and dogged pursuit to detect and find a cure for a fatal genetic disorder called Canavan disease, a rare genetic disease that occurs most frequently in Ashkenazi Jewish families.
Plaintiffs, a group of individuals and non-profit institutions, are attempting to assert legal rights against Defendant researcher and his research institution's commercialization of the fruits of their Canavan disease research. Before the Court is Defendants' Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. Because the Court finds that Plaintiffs have failed to allege sufficient facts as to all their claims except unjust enrichment, the motions are GRANTED in part.

I. BACKGROUND
Plaintiffs Daniel Greenberg ("Greenberg"), Fern Kupfer ("Kupfer"), Frieda Eisen ("Eisen"), David Green ("Green"), Canavan Foundation, Dor Yeshorim, and National Tay-Sachs and Allied Diseases Association, Inc. (collectively "Plaintiffs") brought this diversity action for damages and equitable and injunctive relief to redress Defendants' alleged breach of informed consent, breach of fiduciary duty, unjust enrichment, fraudulent concealment, conversion, and misappropriation of trade secrets. The individual plaintiffs Greenberg, Kupfer, Eisen, and Green are parents of children who were afflicted with Canavan disease. The other Plaintiffs are non-profit organizations that provided funding and information to Defendants to research and discover the Canavan disease gene. Defendants are the physician-researcher, Dr. Reuben Matalon ("Matalon"), Variety Children's Hospital d/b/a Miami Children's Hospital ("MCH"), and the hospital's research affiliate, Miami Children's Hospital Research Institute ("MCHRI").
The Complaint alleges a tale of a successful research collaboration gone sour. In 1987, Canavan disease still remained a mysterythere was no way to identify who was a carrier of the disease, nor was there a way to identify a fetus with Canavan disease. Plaintiff Greenberg approached Dr. Matalon, a research physician who was then affiliated with the University of Illinois at Chicago for assistance. Greenberg requested Matalon's involvement in discovering the genes that were ostensibly responsible for this fatal disease, so that tests could be administered to determine carriers and allow for prenatal testing for the disease.
*1067 At the outset of the collaboration, Greenberg and the Chicago Chapter of the National Tay-Sachs and Allied Disease Association, Inc. ("NTSAD") located other Canavan families and convinced them to provide tissue (such as blood, urine, and autopsy samples), financial support, and aid in identifying the location of Canavan families internationally. The other individual Plaintiffs began supplying Matalon with the same types of information and samples beginning in the late 1980s. Greenberg and NTSAD also created a confidential database and compilationthe Canavan registrywith epidemiological, medical and other information about the families.
Defendant Matalon became associated in 1990 with Defendants Miami Children's Hospital Research Institute, Inc. and Variety Children's Hospital d/b/a Miami Children's Hospital. Defendant Matalon continued his relationship with the Plaintiffs after his move, accepting more tissue and blood samples as well as financial support.
The individual Plaintiffs allege that they provided Matalon with these samples and confidential information "with the understanding and expectations that such samples and information would be used for the specific purpose of researching Canavan disease and identifying mutations in the Canavan disease which could lead to carrier detection within their families and benefit the population at large." Compl. ¶ 21. Plaintiffs further allege that it was their "understanding that any carrier and prenatal testing developed in connection with the research for which they were providing essential support would be provided on an affordable and accessible basis, and that Matalon's research would remain in the public domain to promote the discovery of more effective prevention techniques and treatments and, eventually, to effectuate a cure for Canavan disease." Id. ¶ 22. This understanding stemmed from their "experience in community testing for Tay-Sachs disease, another deadly genetic disease that occurs most frequently in families of Ashkenazi Jewish descent." Id. ¶ 23.
There was a breakthrough in the research in 1993. Using Plaintiffs' blood and tissue samples, familial pedigree information, contacts, and financial support, Matalon and his research team successfully isolated the gene responsible for Canavan disease. After this key advancement, Plaintiffs allege that they continued to provide Matalon with more tissue and blood in order to learn more about the disease and its precursor gene.
In September 1994, unbeknownst to Plaintiffs, a patent application was submitted for the genetic sequence that Defendants had identified. This application was granted in October 1997, and Dr. Matalon was listed as an inventor on the gene patent and related applications for the Canavan disease, Patent No. 5,679,635 (the "Patent"). Through patenting, Defendants acquired the ability to restrict any activity related to the Canavan disease gene, including without limitation: carrier and prenatal testing, gene therapy and other treatments for Canavan disease and research involving the gene and its mutations.
Although the Patent was issued in October 1997, Plaintiffs allege that they did not learn of it until November 1998, when MCH revealed their intention to limit Canavan disease testing through a campaign of restrictive licensing of the Patent. Id. ¶ 29. Specifically, on November 12, 1998, Plaintiffs allege that Defendants MCH and MCHRI began to "threaten" the centers that offered Canavan testing with possible enforcement actions regarding the recently-issued patent. Defendant MCH also began restricting public accessibility through negotiating exclusive licensing agreements and charging royalty fees. Id. ¶ 30.
*1068 Plaintiffs allege that at no time were they informed that Defendants intended to seek a patent on the research. Nor were they told of Defendants' intentions to commercialize the fruits of the research and to restrict access to Canavan disease testing. Id. ¶ 21.
Based on these facts, Plaintiffs filed a six-count complaint on October 30, 2000, against Defendants asserting the following causes of action: (1) lack of informed consent; (2) breach of fiduciary duty; (3) unjust enrichment; (4) fraudulent concealment; (5) conversion; and (6) misappropriation of trade secrets. Plaintiffs generally seek a permanent injunction restraining Defendants from enforcing their patent rights, damages in the form of all royalties Defendants have received on the Patent as well as all financial contributions Plaintiffs made to benefit Defendants' research. Plaintiffs allege that Defendants have earned significant royalties from Canavan disease testing in excess of $75,000 through enforcement of their gene patent, and that Dr. Matalon has personally profited by receiving a recent substantial federal grant to undertake further research on the gene patent.
Although the case was initially filed in the U.S. District Court for the Northern District of Illinois, it was transferred pursuant to an Order entered by the Honorable Robert W. Gettlemen on July 8, 2002. Defendants Matalon and MCH/MCHRI subsequently filed their separate motions to dismiss on September 20, 2003.[1]

II. LEGAL STANDARD
A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiffs well-pleaded facts as true. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 953 (11th Cir.1986).

III. ANALYSIS
Defendants have moved to dismiss the entire Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. The Court will discuss each count sequentially.

A. Lack of Informed Consent
In Count I of the Complaint, the individual Plaintiffs, who served as research subjects, and the corporate plaintiff Dor Yeshorim claim that Defendants owed a duty of informed consent. Compl. ¶ 34. The Complaint alleges a continuing duty of informed consent to disclose any information that might influence their decision to participate or decline to participate in his research. Id Defendants breached this duty, Plaintiffs claim, when they did not disclose the intent to patent and enforce for their own economic benefit the Canavan disease gene. Id. ¶ 36. The duty was also breached by the misrepresentation of the research purpose that Matalon had included on the written consent forms. Id. Finally, the Plaintiffs allege that if they had known that the Defendants would "commercialize" the results of their contributions, they would not have made the contributions. Id. ¶ 38.

1. Duty to Obtain Informed Consent for Medical Research
Defendants first assert that the Complaint fails to state a claim because *1069 the duty of informed consent is only owed to patients receiving medical treatment. Furthermore, they claim that even if the duty extends to non-therapeutic research, it does not extend beyond the actual research to research results.
The doctrine of informed consent grew out of a treating physician's fiduciary duty to disclose to the patient all facts which might affect the patient's decision to allow medical treatment. The basic principle of informed consent has been embraced by tort law in order to guard a patient's control over decisions affecting his or her own health. See Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 269, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The state common law of informed consent is often fortified by statute. Florida's medical consent law, for example, applies to the patient/treating doctor relationship. Fla. Stat. § 766.103.
The question of informed consent in the context of medical research, however, is a relatively novel one in Florida. Medical consent law does not apply to medical researchers. Id.; See also Cedars Med. Ctr., Inc. v. Jose R. Gomez, 738 So.2d 362, 366 (Fla. 3d DCA 1999) (excluding Hospital from statutory duty of informed consent). Florida Statute § 760.40 does require, however, that a person's informed consent must be obtained when any genetic analysis is undertaken on a his or her tissue.
Defendants argue that this statute is inapplicable to the case at bar because the statute does not apply to medical research, only test results. Moreover, none of the individual Plaintiffs have alleged that they were personally tested, just that they donated their genetic material. Furthermore, although Federal regulations do mandate that consent must be obtained from the subjects of medical research, the informed consent does not cover more than the research itself. See, e.g., 21 C.F.R. §§ 50.1-50.27 (2000). Other courts in New York and Pennsylvania have dismissed attempts by patient plaintiffs to stretch the informed consent doctrine to cover medical research. See Hecht v. Kaplan, 221 A.D.2d 100, 645 N.Y.S.2d 51, 53 (N.Y.App. Div.1996) (blood test performed on unused vial of blood does not constitute human research sufficient to trigger informed consent law); Doe v. Dyer-Goode, 389 Pa.Super. 151, 566 A.2d 889, 892-93 (1989) (additional test conducted on extracted sample of blood insufficient to permit action ground in battery (i.e. informed consent)). Plaintiffs contend these cases are distinguishable because they do not address informed consent in the research setting or the related issue of commercialization.
With Florida statutory law at best unclear on the duty of informed consent relating to medical research, Plaintiffs refer to cases in other jurisdictions where courts have found that researchers face a duty to obtain informed consent from their research subjects. See Grimes v. Kennedy Krieger Inst, 366 Md. 29, 782 A.2d 807 (2001) (medical researchers had duty to disclose that children participating in research study were subject to lead-based paint); In re Cincinnati Radiation Litig., 874 F.Supp. 796 (S.D.Ohio 1995) (non-disclosure to patients about exposure to radiation).
Defendants counter that these cases are inapposite because Plaintiffs miss the crucial distinction between the use of medical research and human experimentation. Each of the cases cited by Plaintiffs as providing a duty of informed consent regarding medical research was based on some egregious practice, which Defendants argue is absent here. Additionally, there was no actual human experimentation as part of an ongoing relationship alleged in the Complaint.
*1070 Since the law regarding a duty of informed consent for research subjects is unsettled and fact-specific and further, Defendants conceded at oral argument that a duty does attach at some point in the relationship, the Court finds that in certain circumstances a medical researcher does have a duty of informed consent. Nevertheless, without clear guidance from Florida jurisprudence, the Court must consider whether this duty of informed consent in medical research can be extended to disclosure of a researcher's economic interests.

2. Extension of Duty of Informed Consent to the Researcher's Economic Interests
Defendants assert that extending a possible informed consent duty to disclosing economic interests has no support in established law, and more ominously, this requirement would have pernicious effects over medical research, as it would give each donor complete control over how medical research is used and who benefits from that research. The Court agrees and declines to extend the duty of informed consent to cover a researcher's economic interests in this case.
Plaintiffs cite a variety of authorities in support of their contention that the duty of informed consent mandates that research subjects must be informed of the financial interests of the researcher. They first rely on Moore v. Regents of the University of California, where the court held that a physician/researcher had a duty of informed consent to disclose that he was both undertaking research and commercializing it. 51 Cal.3d 120, 271 CaLRptr. 146, 793 P.2d 479, 486 (Cal.1990). Plaintiffs also reference a Florida law that requires health care providers to provide written disclosures to patients of potential financial conflicts of interest. Fla. Stat. § 456.052 (precluding referrals by health care providers unless their financial interest is disclosed). Finally, in Grimes, the Maryland Court of Appeals found that researchers must provide "all material information" to their subjects. Grimes, 782 A.2d at 844.
These authorities do not control the outcome here, however, and the Court is not persuaded that they can be synthesized into a viable extension of the duty of informed consent. Moreover, Defendants correctly contest Plaintiffs' interpretation of Moore, the case that is most analogous to the situation at hand. Moore involved a physician breaching his duty when he asked his patient to return for follow-up tests after the removal of the patient's spleen because he had research and economic interests. Moore, 271 Cal.Rptr. 146, 793 P.2d at 481-82. The doctors did not inform their patient that they were using his blood and tissue for medical research. Id. at 483. The allegations in the Complaint are clearly distinguishable as Defendants here are solely medical researchers and there was no therapeutic relationship as in Moore.
In declining to extend the duty of informed consent to cover economic interests, the Court takes note of the practical implications of retroactively imposing a duty of this nature. First, imposing a duty of the character that Plaintiffs seek would be unworkable and would chill medical research as it would mandate that researchers constantly evaluate whether a discloseable event has occurred.[2] Second, *1071 this extra duty would give rise to a type of dead-hand control that research subjects could hold because they would be able to dictate how medical research progresses. Finally, the these Plaintiffs are more accurately portrayed as donors rather than objects of human experimentation, and thus the voluntary nature of their submissions warrants different treatment. Accordingly, the Court finds that Plaintiffs have failed to state a claim upon which relief may be granted, and this count is DISMISSED.

B. Breach of Fiduciary Duty
The individual Plaintiffs allege in Count II of the Complaint that all the Defendants were in a fiduciary relationship with them, and as such, they should have disclosed all material information relating to the Canavan disease research they were conducting, including any economic interests of the Defendants relating to that research. Compl. ¶ 43.
As a threshold issue, Defendants argue that if the Court finds that there is no claim for informed consent, then the claim for breach of fiduciary duty evaporates as both claims have the same elements. Courts routinely hold that where a patient's claim that the doctor breached his fiduciary duty arises from the same operative facts and results in the same injury as another claim asserted against the doctor, then the breach of fiduciary claim is duplicative and should be dismissed. See Neade v. Portes, 193 Ill.2d 433, 250 Ill.Dec. 733, 739 N.E.2d 496 (2000) (breach of fiduciary claim dismissed because duplicative of the claim of informed consent regarding failure to inform of financial arrangement with HMO). Defendants argue that the two claims are virtually identical, because the damages and liability allegations are very similar, and are both premised on the same duty of disclosure. The Court finds, nevertheless, that a full treatment of this claim is still appropriate as the two claims are not fully congruent.

1. Fiduciary Relationship
Defendants have moved to dismiss this count because Plaintiffs did not plead the elements of a fiduciary relationship. Fiduciary relations are either expressly or impliedly created. Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994). A fiduciary duty implied in law is premised upon the specific factual set of circumstances surrounding the transaction and the relationship of the parties. Id. Florida courts have found fiduciary relationships in this context when "confidence is reposed by one party and a trust accepted by the other." Id. (quoting Dale v. Jennings, 90 Fla. 234, 107 So. 175, 179 (1926)). This is a two-way relationship, and a fiduciary relationship will only be found when the plaintiff separately alleges that the plaintiff placed trust in the defendant and the defendant accepted that trust. See Abele v. Sawyer, 747 So.2d 415, 417 (Fla. 4th DCA 1999). In Florida, once a fiduciary relationship is established, a fiduciary has a legal duty to "disclose all essential or material facts pertinent or material to the transaction in hand." Dale v. Jennings, 90 Fla. 234, 107 So. 175 (1926).
Defendants assert that the Complaint does not allege any facts that show that the trust was recognized and accepted. See Harris v. Zeuch, 103 Fla. 183, 137 So. 135, 138 (1931) ("There is nothing to show that the complainant recognized or accepted any trust repose in himself by Mr. Harris relating to the said transaction"). *1072 Plaintiffs allege, however, that Defendants accepted the trust by undertaking research that they represented as being for the benefit of the Plaintiffs. Compl. ¶ 37 (research purpose defined as "to identify mutations in the Canavan gene which may lead to carrier detection within my family"). Plaintiffs rely on other state courts which have held that researchers and research institutions are fiduciaries for their research subjects. For example, in Grimes, the Maryland Supreme Court held that "the very nature of nontherapuetic scientific research on human subjects can, and normally will, create special relationships out of which duties arise." Grimes, 782 A.2d at 834-35.
Taking all the facts alleged as true, the Court finds that Plaintiffs have not sufficiently alleged the second element of acceptance of trust by Defendants and therefore have failed to state a claim. There is no automatic fiduciary relationship that attaches when a researcher accepts medical donations and the acceptance of trust, the second constitutive element of finding a fiduciary duty, cannot be assumed once a donation is given. Accordingly, this claim is DISMISSED.

C. Unjust Enrichment
In Count III of the Complaint, Plaintiffs allege that MCH is being unjustly enriched by collecting license fees under the Patent. Under Florida law, the elements of a claim for unjust enrichment are (1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit; (2) the defendant voluntarily accepted and retained the benefit; and (3) under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it. Tooltrend, Inc., v. CMT Utensili SRL, 198 F.3d 802, 805 (11th Cir.1999); Duncan v. Kasim, Inc., 810 So.2d 968, 971 (2002). The Court finds that Plaintiffs have sufficiently alleged the elements of a claim for unjust enrichment to survive Defendants' motion to dismiss.
While the parties do not contest that Plaintiffs have conferred a benefit to Defendants, including, among other things, blood and tissue samples and soliciting financial contributions, Defendants contend that Plaintiffs have not suffered any detriment, and note that no Plaintiff has been denied access to Canavan testing. Furthermore, the Plaintiffs received what they soughtthe successful isolation of the Canavan gene and the development of a screening test. Plaintiffs argue, however, that when Defendants applied the benefits for unauthorized purposes, they suffered a detriment. Had Plaintiffs known that Defendants intended to commercialize their genetic material through patenting and restrictive licensing, Plaintiffs would not have provided these benefits to Defendants under those terms.
Naturally, Plaintiffs allege that the retention of benefits violates the fundamental principles of justice, equity, and good conscience. While Defendants claim that they have invested significant amounts of time and money in research, with no guarantee of success and are thus entitled to seek reimbursement, the same can be said of Plaintiffs. Moreover, Defendants' attempt to seek refuge in the endorsement of the U.S. Patent system, which gives an inventor rights to prosecute patents and negotiate licenses for their intellectual property fails, as obtaining a patent does not preclude the Defendants from being unjustly enriched. See Chou v. Univ. of Chicago, 254 F.3d 1347, 1363 (Fed.Cir. 2001) (recognizing claim for unjust enrichment in context of gene patent dispute). The Complaint has alleged more than just a donor-donee relationship for the purposes of an unjust enrichment claim. Rather, the facts paint a picture of a continuing research collaboration that involved *1073 Plaintiffs also investing time and significant resources in the race to isolate the Canavan gene. Therefore, given the facts as alleged, the Court finds that Plaintiffs have sufficiently pled the requisite elements of an unjust enrichment claim and the motion to dismiss for failure to state a claim is DENIED as to this count.

D. Fraudulent Concealment
Count IV of the Complaint alleges that MCH fraudulently concealed from the Plaintiffs that (1) the Hospital would economically benefit from Canavan research; (2) it would patent the Canavan gene mutation; and (3) it would license the testing under the Patent.
The elements of a claim for fraudulent concealment under Florida law are:
(1) a misrepresentation of material fact or suppression of the truth; (2)[a] knowledge of the representor of the misrepresentation, or [b] representations made by the representor without knowledge as to either the truth or falsity, or [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce another to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation.
Jones v. General Motors Corp., 24 F.Supp.2d 1335, 1339 (M.D.Fla.1998) (internal citation omitted). A fraudulent concealment claim is subject to Fed.R.Civ.P. 9(b)'s requirement that the circumstances constituting fraud shall be stated with particularity. Under Rule 9(b), the circumstances of the fraud must be alleged with specificity, i.e. the "who, what, when, where, and how" of the alleged fraud. Di-Leo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).
As a threshold matter, the Court finds that Plaintiffs have not satisfied this heightened pleading standard. None of the elements constituting fraudulent concealment are sufficiently pled in the Complaint. First, Plaintiffs claim that Florida law allows for a cause of action for fraudulent concealment of not disclosing one's intentions. Mettler, Inc. v. Ellen Tracy, Inc., 648 So.2d 253, 255 (Fla. 2d DCA 1994). Yet, their bare contention that the intent to patent was fraudulently concealed is not sufficient, because this intent was not accompanied by any time and place details. Graue Mill Dev. Corp. v. Colonial Bank & Trust Co., 927 F.2d 988, 992 (7th Cir.1991). The Plaintiffs have failed to provide more specificity as the Defendants' concealment of intent to patent and the timing of Plaintiffs' donations.
Second, there was no duty of disclosure to the Plaintiffs. Allegations of fraudulent concealment by silence must be accompanied by allegations of a special relationship that gives rise to a duty to speak. TransPetrol, Ltd. v. Radulovic, 764 So.2d 878, 879-80 (Fla. 4th DCA 2000). Plaintiffs have not sufficiently alleged that they had a fiduciary relationship with Defendants, as noted in Section B, supra
Third, the facts asserted as fraudulently concealed were accessible to the Plaintiffs. A patent becomes public knowledge when issued and Plaintiffs could have undertaken due diligence to uncover the facts surrounding the patent application. In re Ford Motor Co. Bronco II Product Liability Litig. 982 F.Supp. 388, 396-97 (E.D.La.1997) ("Claims of fraudulent concealment generally require that plaintiff allege and prove that defendant wrongfully concealed information and that plaintiff did not have actual or constructive knowledge of the information, and could not have learned of the information through the exercise of due diligence "Xemphasis added). Plaintiffs' allegations that they were prevented from making reasonable inquiries *1074 because they had no reason to believe that patenting would occur is unavailing because if they were so concerned about a possible intent to patent then a simple phone inquiry to the Defendants would have uncovered this fact.
Finally, as to the damages element, Plaintiffs point to the specific injury that they have suffered; namely, the denial of their prolonged efforts in contributing time and resources to research that they thought was designed for non-commercial purposes. This is not any sort of cognizable injury, however, since the Complaint does not allege any individualized denial of testing nor does it claim any other economic injury.
Plaintiffs contend that, but for the fraudulent non-disclosure, they would have acted differently. Nevertheless, fraud must be specially pled, and the Complaint does not adequately allege a claim based on a special relationship or of injury nor does it allege more specifics about efforts at concealment or about any representations made by Matalon as to what he would do with the test results. Therefore, the Court finds that the Complaint lacks the specificity required by Fed.R.Civ.P. 9(b). Accordingly, the fraudulent concealment claim is DISMISSED.

E. Conversion
The Plaintiffs allege in Count V of their Complaint that they had a property interest in their body tissue and genetic information, and that they owned the Canavan registry in Illinois which contained contact information, pedigree information and family information for Canavan families worldwide. They claim that MCH and Matalon converted the names on the register and the genetic information by utilizing them for the hospitals' "exclusive economic benefit." Compl. ¶ 65. The Court disagrees and declines to find a property interest for the body tissue and genetic information voluntarily given to Defendants. These were donations to research without any contemporaneous expectations of return of the body tissue and genetic samples, and thus conversion does not lie as a cause of action.
In Florida, the tort of "conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Nat'l Union Fire Ins. Co. of Penn. v. Carob. Aviation, Inc., 759 F.2d 873, 878 (11th Cir.1985) (citing Senfeld v. Bank of Nova Scotia Trust Co. (Cayman), 450 So.2d 1157, 1160-61 (Fla. 3d DCA 1984)) (citation omitted). Using property given for one purpose for another purpose constitutes conversion. See All Cargo Transport, Inc. v. Fla. East Coast Ry. Co., 355 So.2d 178, 179 (Fla. 3d DCA 1978).
First, Plaintiffs have no cognizable property interest in body tissue and genetic matter donated for research under a theory of conversion. This case is similar to Moore v. Regents of the University of California, where the Court declined to extend liability under a theory of conversion to misuse of a person's excised biological materials. 51 Cal.3d 120, 271 Cal.Rptr. 146, 793 P.2d 479, 488 (Cal.1990) The plaintiff in Moore alleged that he had retained a property right in excised bodily material used in research, and therefore retained some control over the results of that research. The California Supreme Court, however, disagreed and held that the use of the results of medical research inconsistent with the wishes of the donor was not conversion, because the donor had no property interest at stake after the donation was made. Moore, 271 Cal.Rptr. 146, 793 P.2d at 497 ("No court has ever in a reported decision imposed conversion liability for the use of human cells in medical research."). The Court also recognized that the patented result of research is "both factually and legally distinct" from *1075 excised material used in the research. Id. at 492.
Second, limits to the property rights that attach to body tissue have been recognized in Florida state courts. For example, in State v. Powell, 497 So.2d 1188, 1192 (Fla.1986), the Florida Supreme Court refused to recognize a property right in the body of another after death. Similarly, the property right in blood and tissue samples also evaporates once the sample is voluntarily given to a third party.
Plaintiffs rely on Pioneer Hi-Bred v. Holden Foundation, 1987 WL 341211 (S.D.Iowa, Oct.30, 1987), aff'd, 35 F.3d 1226 (8th Cir.1994), for their assertion that genetic information itself can constitute property for the purposes of the tort of conversion. Id. at *36. In that case, the Court held that a corn seed's property interest in the genetic message contained in a corn seed variety is property protected by the laws of conversion. Id. Plaintiffs argue that giving permission for one purpose (gene discovery) does not mean they agreed to other uses (gene patenting and commercialization). Yet, the Pioneer court recognized that, "where information is gathered and arranged at some cost and sold as a commodity on the market, it is properly protected as property." Id. at *35. This seemingly provides more support for property rights inherent in Defendants' research rather than the donations of Plaintiffs' DNA. Finally, Plaintiffs cite a litany of cases in other jurisdictions that have recognized that body tissue can be property in some circumstances. See, e.g., Brotherton v. Cleveland, 923 F.2d 477, 482 (6th Cir.1991) (aggregate of rights existing in body tissue is similar to property rights); York v. Jones, 717 F.Supp. 421, 425 (E.D.Va.1989) (couple granted property rights in their frozen embryos). These cases, however, do not involve voluntary donations to medical research.
Additionally, the Florida statute on genetic testing is cited by Plaintiffs in support of their contention that persons who contribute body tissue for researchers to use in genetic analysis do not relinquish ownership of the results of the analysis. Fla. Stat. § 760.40 (2002). This statute, however, is inapplicable under a common law theory of conversion, because by its plain meaning, it only provides penalties for disclosure or lack of informed consent if a person is being genetically analyzed. Fla. Stat. § 760.040(2). Plaintiffs have not cited any case that interprets the statute as applying to an analogous factual situation, and this Court's investigation did not find any relevant case either. Moreover, even assuming, arguendo, that the statute does create a property right in genetic material donated for medical research purposes, it is unclear whether this confers a property right for conversion, a common law cause of action.
Finally, although the Complaint sets out that Plaintiff Greenberg owned the Canavan Registry, the facts alleged do not sufficiently allege the elements of a prima facie case of conversion, as the Plaintiffs have not alleged how the Defendants' use of the Registry in their research was an expressly unauthorized act. The Complaint only alleges that the Defendants "utilized the information and contacts for their exclusive economic benefit." Compl. ¶ 66. There is no further allegations of the circumstances or conditions that were attached to the Defendants' use of the Canavan Registry. Nor are there any allegations about any of the Plaintiffs' entitlement to possess the Registry.
The Court finds that Florida statutory and common law do not provide a remedy for Plaintiffs' donations of body tissue and blood samples under a theory of conversion liability. Indeed, the Complaint does not allege that the Defendants used the *1076 genetic material for any purpose but medical research. Plaintiffs claim that the fruits of the research, namely the patented material, was commercialized. This is an important distinction and another step in the chain of attenuation that renders conversion liability inapplicable to the facts as alleged. If adopted, the expansive theory championed by Plaintiffs would cripple medical research as it would bestow a continuing right for donors to possess the results of any research conducted by the hospital. At the core, these were donations to research without any contemporaneous expectations of return. Consequently, the Plaintiffs have failed to state a claim upon which relief may be granted on this issue. Accordingly, this claim is DIMISSED.

F. Misappropriation of Trade Secrets
The Plaintiffs' final claim is that MCH misappropriated a trade secretthe registry of people who had Canavan disease. Florida's Trade Secrets Act[3] defines a trade secret as:
information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derive(s) independent economic value, actual, or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Fla. Stat. § 688.002(4). See Merrill Lynch Pierce, Fenner & Smith, Inc. v. Silcox, 2001 WL 1200656, at *5 (S.D.Fla. Oct.4, 2001). Whether a particular type of information constitutes a trade secret is a question of fact and cannot be resolved on a motion to dismiss. Del Monte Fresh Produce Co. v. Dole Food Co., 136 F.Supp.2d 1271,1294 (S.D.Fla.2001).
Florida courts have repeatedly held that lists comprising information, such as names of patients, blood donors, and customers can qualify as trade secrets. Unistar Corp. v. Child, 415 So.2d 733, 734 (Fla. 3rd DCA 1982) (customer list reflecting "considerable effort, knowledge, time, and expense" on the part of the plaintiff found to constitute a trade secret). However, to qualify as a trade secret, information that the Plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protects its secrecy. See Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir.1998) (applying Florida law).
At the outset, Defendants dismiss Plaintiffs' characterization of the Canavan registry as a trade secret. First, Defendants assert that Plaintiffs have not alleged that the registry belonged to any Plaintiff. Second, Defendants argue that the registry itself was not alleged to have any independent "economic value" for the purposes of Florida law since the Complaint does not allege the registry had any economic value derived from the confidentiality. Fla. Stat. § 688.002. Finally, a trade secret must be the subject of efforts "reasonable under the circumstances to maintain it[s] secrecy." Id. Defendants claim that there is nothing in the Complaint which indicates that any efforts were made to keep secret the Registry.
Plaintiffs counter Defendants' assertion that the Canavan registry is not a trade secret because it had value, in that it streamlined Matalon's research and was *1077 treated as confidential because it contained confidential information such as contact details, pedigree, and familial information for families world wide. Compl. ¶¶ 70-72.
While it is clear that the Complaint does allege that the Plaintiffs Greenberg and NTSAD created the list, "expending] time, money, and other efforts,"other key indicia of a trade secret are missing. Id. ¶ 69. Plaintiffs do not allege that the list derived economic value from not being generally know to others. The Complaint merely states that it had "substantial economic value" in streamlining Matalon's research. Id. ¶ 71. Second, there is no allegation that the Plaintiffs undertook measures to keep the list confidential. Plaintiffs only allege that there was an "expectation that it would remain confidential." Id. ¶ 72.
Even assuming, arguendo, that the Court finds that the Canavan Registry is a trade secret, Plaintiffs have not sufficiently alleged how the trade secret was misappropriated. To establish a claim for misappropriation of trade secrets under Florida law, Plaintiffs must show that (1) they possessed valuable confidential information and took reasonable steps to protect it and (2) the information was "misappropriated," either by one who knew or had reason to know that secret was improperly obtained or by one who used improper means to obtain it. Del Monte Fresh Produce Co., 136 F.Supp.2d at 1291 (citing Fla Stat. § 688.002). Misappropriation includes "disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Fla. Stat. § 688.002(2).
The Canavan Registry was not misappropriated by MCH because there is no allegation that MCH knew or should have known that the Canavan Registry was a confidential trade secret guarded by Plaintiffs, and furthermore, that Matalon had acquired through improper means. Plaintiffs' theory that Defendants misappropriated the Registry once Matalon and MCH chose to use the Registry beyond the use for which it was authorized does not pass muster, since there was no explicit authorization that the Registry be used for a certain purpose in the first place. Plaintiffs cannot donate information that they prepared for fighting a disease and then retroactively claim that it was a protected secret.
Accordingly, the Court finds that Plaintiffs have failed to state a claim regarding misappropriation of trade secret as the they have not sufficiently alleged the requisite elements to convert the Registry into an actionable trade secret. This claim is therefore DISMISSED.

IV. CONCLUSION
THIS CAUSE came before the Court upon Defendant Reuben Matalon's Rule 12(b)(6) Motion to Dismiss Complaint (D.E. No. 7), filed on September 20, 2002, and Defendant Miami Children's Hospital Research Institute, Inc., and Variety Children's Hospital, Inc. d/b/a Miami Children's Hospital's Motion to Dismiss (D.E. No. 9), filed on September 20, 2002.
THE COURT has carefully considered the motions, the responses and the pertinent portions of the record, and being otherwise fully advised in the premises and in open court, it is
ADJUDGED that the motions are GRANTED in part. Accordingly, Count I (lack of informed consent), Count II (breach of fiduciary duty), Count IV (fraudulent concealment), Count V (conversion) and Count VI (misappropriation of trade secrets) are DISMISSED with prejudice.
*1078 ADJUDGED that the motions to dismiss are DENIED as to Count III (unjust enrichment). Accordingly, Defendants shall file an answer to Count III no later than June 20, 2003.
NOTES
[1] Defendant Matalon has adopted the Memorandum of Law filed by MCH and MCHRI in support of their Motion to Dismiss.
[2] Plaintiffs claim that disclosure of a commercial interest is already mandated by the American Medical Association's Code of Ethics professional guidelines for physicians/researchers. It provides that "[p]otential commercial applications must be disclosed to the patient before a profit is realized on products developed from biological materials" and "[h]uman tissue and its products may not be used for commercial purposes without the informed consent of the patient who provided the original cellular material." AMA Code of Ethics, E -208. Yet these regulations were only promulgated in 1994 and there is no evidence that they bind the parties in this case.
[3] Although the Complaint ostensibly claims that Defendants violated the Illinois Trade Secrets Act, the Court, following traditional choice of law precepts, applies the law of the forum.