437 F.Supp.2d 985 (2006)
THE WASHINGTON UNIVERSITY, Plaintiff,
v.
William J. CATALONA, et. al., Defendants.
No. 4:03CV1065SNL.
United States District Court, E.D. Missouri, Eastern Division.
March 31, 2006.
*986 *987 Allison G. Schnieders, Joseph Alexander Lawrence, Morrison and Foerster LLP, New York, NY, Elizabeth A. Teutenberg, Thomas E. Wack, Douglas W. King, Bryan Cave LLP, St. Louis, MO, H. Preston Moore, Matthew D'Amore, Morrison and Foerster LLP, San Francisco, CA, Sherman W. Kahn, Morrison and Foerster LLP, Los Angeles, CA, for Plaintiff.
Gene C. Schaerr, Winston & Strawn LLP, Washington, DC, Gregory R. Piche, Holland and Hart, Denver, CO, Jim J. Shoemake, Troy A. Doles, Guilfoil and Petzall, Burton H. Shostak, Moline and Shostak, St. Louis, MO, Janet F. Catalona, Patricia K. Susi, Catalona Law Firm, L.L.C., Clayton, MO, for Defendants.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
Plaintiff Washington University (hereinafter referred to as "WU") has filed this declaratory judgment action seeking to establish "ownership", and thereby, the destiny of certain research biological materials currently stored in the GU Biorepository. Central to the several pending *988 summary judgment motions, and preliminary injunction motion(s) is the issue of "ownership"; thus, the Court determined that the most logical and efficient manner in which to address this issue was to hold a permanent injunction hearing in which all interested parties, including research participants who "donated" the subject biological materials, could coherently present their argument to the Court. On April 9 through 11, 2005, such a hearing took place before this Court. At the conclusion of the hearing, all parties were permitted to file post-hearing briefs, and this matter is now ripe for disposition.
After careful consideration of all objections to exhibits and testimony taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at the hearing are received into evidence. All testimony will be considered by the Court and given its due weight. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and any other evidentiary materials submitted for the Court's consideration, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT[1]
Plaintiff Washington University (WU) is a Missouri not-for-profit corporation with its principal place of business in St. Louis, Missouri. WU is one of the leading private research universities in this country, if not in the world. As a research university, it has a medical school (Washington University School of Medicine) that includes a Department of Surgery and a Division of Urologic Surgery. The medical faculty regularly pursues and publishes significant original medical research. Within the Division of Urologic Surgery, WU physicians treat patients, teach students and residents, and conduct medical research.
Defendant William J. Catalona, M.D.[2] is a highly respected urologist and urologic surgeon, as well as a well-established medical researcher regarding prostate cancer. He was employed by WU from July 1, 1976 until February 23, 2003. Dr. Catalona was Chief of the Urology Division from 1984 to 1998. While at WU, Dr. Catalona performed thousands of surgeries, including prostate cancer surgeries. He was instrumental in establishing the GU[3] Biorepository for the collection and storage of biological research materials. In 2003, Dr. Catalona left his position with WU to take a similar position with Northwestern University in Chicago, Illinois and to continue his prostate cancer research.
The GU Biorepository houses biological specimens of prostate tissue, blood, and DNA samples for prostate cancer research. Patients of Dr. Catalona, as well as several other WU physicians, contributed biomaterials for prostate cancer research. As of the date of the hearing, there were more than 30,000 research participants enrolled in prostate cancer research studies; of these, 2500-3000 had *989 been patients of Dr. Catalona. There are approximately 3500 prostate tissue samples in the GU Biorepository taken from patients of Dr. Catalona and other WU physicians within the Urologic Surgery Division. There are approximately 100,000 serum samples in the GU Biorepository; 75% of these contributions were made from research participants who were not patients of Dr. Catalona or any other WU physician. Approximately 4400 men contributed DNA samples to the GU Biorepository; again, some were patients of Dr. Catalona, while others were not. The GU Biorepository is not used for clinical care or follow-up care; it is strictly used for research purposes. At times, other research institutions have requested and received samples from the GU Biorepository for research projects outside of WU (or in partnership with WU). The transfer of such material is made pursuant to a Material Transfer Agreement (MTA). At least seven (7) of these MTAs personally signed by Dr. Catalona acknowledge WU as the owner of the biological samples at issue in this case. Plaintiff's Exhibits 7-10, 12-14.
At all relevant times, the GU Biorepository has been housed in one or more buildings owned by WU. At all relevant times, WU employees have administered the GU Biorepository. WU has provided the majority of funding necessary to operate and maintain the GU Biorepository. External funding for the GU Biorepository is in the form of public and private grants made to and administered by WU as the grantee. Dr. Catalona, as a WU employee and physician, has raised several million dollars in outside funding for the GU Biorepository. Other WU employees, most notably Dr. Gerald Andriole (Dr. Catalona's successor as Urology Division Chief), have raised substantial funds for the GU Biorepository.
WU's Intellectual Property Policy states that "all intellectual property (including . . . tangible research property) shall be owned by the University if significant University resources were used or if it is created pursuant to a research project funded through corporate, federal, or other external sponsors administered by the University." Plaintiff's Exhibit 17, § I . .3(a). It further states "[G]enerally, creators and research investigators will retain custody of tangible research property while at the University." Plaintiff's Exhibit 17, § 1.3(a).
Defendants Richard Ward, Thomas McGurk, Luis Garcia, Antonio Castro, Phillip Wilard, Ivan Parsons, James Ellis, and Michael Missios[4] are/were patients of Dr. Catalona and participants in one or more research projects at WU in which Dr. Catalona was involved.[5]
During the relevant time-period, several prostate cancer studies have been undertaken by Dr. Catalona and other doctors in the Urology Division. Dr. Catalona, as well as other WU physicians, were named "Principal Investigators" on these studies. Dr. Catalona testified that the principal investigator "is in charge of conducting [a] research protocol." Tr. 1:46.[6] The testimony *990 at the hearing established that regardless of who was listed as the "Principal Investigator", the research studies were a collaborative effort involving substantial work by many individuals, all of whom were/are employees of WU.
In order to carry out the subject prostate cancer research studies[7], surgical and non-surgical research participants (hereinafter referred to as "RPs") were invited to participate in genetic cancer research. If they agreed to participate, they had to sign "informed consent" forms. Although the informed consent forms differed slightly due to variances in the protocol and the particulars of each Principal Investigator, generally they all contained the similar language. The informed consent forms typically bore the WU Medical Center logo. Plaintiff's Exhibits 27, 58, 59, 60, 61, and 98; Catalona Exhibit UUU; RP Exhibit 1. The informed consent forms state that the collection of samples is for medical research and not for patient care. They typically stated that the RP could not "claim ownership rights" to any medical or scientific product that results from research with the sample. They typically use the word "donate" to characterize the delivery of the sample (blood, tissue and/or DNA) from the RP to the WU physician or another WU medical technician. They typically state that by participating, the RP "make[s] a free and generous gift of your [blood, tissue and/or DNA] to research that may benefit others." Furthermore, the typical WU informed consent form states that "[y]our participation is voluntary and you may choose not to participate in this research study or withdraw your consent at any time." Some forms use the phrase "withdraw my consent and discontinue participation." None of the submitted WU informed consent forms address the issue of the RP withdrawing samples from the GU Biorepository or the RP requesting samples be sent to another institution.
Along with the informed consent forms, RPs are given a WU Genetic Research Brochure (to also sign) which generally addresses the issues of primary importance to the RP. Catalona Exhibit X. Under the section: What if you change your mind?, the brochure states the following: "To request that your tissue no longer be used for research, you should call the investigator listed on the consent form. Your tissue will be identified and destroyed upon request. Any research results already obtained cannot be destroyed or recalled." Nowhere in the brochure does it state anything about a RP withdrawing his/her sample or a RP requesting that his/her sample be transferred to another facility.
WU is a federally approved and regulated institution for the human-subject research involving the GU Biorepository. The Department of Health and Human Services (HHS) office known as the Office for Human Research Protection (OHRP) is responsible for the oversight of compliance by WU, and all other federally-funded institutions, engaging in human-subject research studies.[8] The OHRP requires that such institutions and facilities comply with the federal regulations set forth at 45 C.F.R. Part 46, a.k.a. "The Common Rule".[9] Among other things, the Common Rule requires every institution conducting *991 and/or sponsoring human-subject research to create and maintain an institutional review board a.k.a. IRB. 45 C.F.R. § 46.103. "An IRB shall review and have authority to approve, require modifications, in (to secure approval), or disapprove all research activities covered by this policy." 45 C.F.R. § 46.109(a). "An IRB shall require that information given to subjects as part of informed consent is in accordance with Sec. 46.116." 45 C.F.R. § 46.109(b). The IRB relevant to the GU Biorepository is known as the Human Studies Committee a.k.a. HSC.
The federal regulations also require WU to provide written assurance to the OHRP of its compliance with the Common Rule. 45 C.F.R. § 46.103(a). Such "assurance" should include "(1) a statement of principles governing the institution in the discharge of its responsibilities for protecting the rights and welfare of human subjects of research conducted at or sponsored by the institution, regardless of whether the research is subject to federal regulation. This may include an appropriate existing code, declaration, or statement of ethical principles, or a statement formulated by the institution itself'; (2) the designation of one or more IRBs established in accordance with the requirements of this policy; (3) a list of IRB members; and (4) "[w]ritten procedures which the IRB will follow (I) for conducting its initial and continuing review of research and for reporting its findings and actions to the investigator and the institution; (ii) for determining which projects require review more often than annually and which projects need verification from sources other than the investigator that no material changes have occurred since previous IRB review; and (iii) for ensuring prompt reporting to the IRB of proposed changes in a research activity and for ensuring that such changes in approved research, during the period for which IRB approval has already been given, may not be initiated without IRB review and approval except when necessary to eliminate apparent immediate hazards to the subject." 45 C.F.R. § 46.103(b)(1)(4).
In compliance with the federal regulations, as stated before, WU has created and maintained an IRB known as the HSC. The HSC has created and maintained a written document entitled Policies/Procedures for Protection of Human Research Subjects. Catalona Exhibit O. The HSC has also created and maintained a written document entitled Washington University School of Medicine  Human Studies Committee  Standard Operating Procedures. Catalona Exhibit P. Finally, the DHHS has approved the relevant Multiple Project Assurance submitted by WU. Catalona Exhibit I.
The Common Rule also sets forth certain requirements for informed consent. 45 C.F.R. § 46.116. Foremost, the Common Rule requires that:
"Except as provided elsewhere in this policy, no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative. No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal *992 rights, or releases or appears to release the investigator, the sponsor, the institution or its agents from liability for negligence."
Among the basic elements to be included in an informed consent are:
"(8) A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."
45 C.F.R. § 46.116(a)(8).
Additional elements of informed consent, when appropriate, may include:
"(4) The consequences of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject; . . . "
45 C.F.R. § 46.116(b)(4).
The federal regulations do not elaborate as to what is involved when a RP "discontinue[s] participation" and/or "withdraw[s] from the research". The federal regulations do not address the matter of a RP's "right" to physically possess their samples upon termination of their participation in a research study; or, a "right" to direct their sample[s] transfer to another institution or Principal Investigator.
The OHRP publishes a guidance document addressing the issue of prohibited exculpatory language in informed consent forms. Catalona Exhibit Q. This document was the result of a 1996 Cooperative Oncology Chairperson Group meeting. The guidance document provides examples of "exculpatory language" that should not be considered for use in informed consent forms pursuant to 45 C.F.R. § 46.116. One of the examples given states: "By consent to participate in this research, I give up any property rights I may have in bodily fluids or tissue samples obtained in the course of the research." These examples are not listed anywhere or referred to anywhere in the relevant federal regulations.
Finally, 45 C.F.R. § 46.117 requires that informed consent be documented as follows:
"(a) Except as provided in paragraph (c) of this section, informed consent shall be documented by the use of a written consent form approved by the IRB and signed by the subject or the subject's legally authorized representative. A copy shall be given to the person signing the form."
(b) Except as provided in paragraph (c) of this section, the consent form may be either of the following:
(1) A written consent document that embodies the elements of informed consent required by § 46.116. (remainder of paragraph omitted)
As of the date(s) of the hearing, no regulatory agency, including the OHRP, has taken any action against WU regarding the informed consent forms used during the relevant time-period.
If a RP chooses to discontinue participation, federal and state regulations govern the options WU has regarding the tissue/blood/DNA sample. The undisputed testimony was that 1) WU may destroy samples it no longer needs for research; 2) store the samples indefinitely; and/or 3) choose to "anonymize" the samples and continue to use them in certain areas of research[10]. Furthermore, if a prostate cancer surgical patient elects not to participate in research at the time of his prostate surgery, that portion of the diseased tissue not needed for clinical use must, in *993 accordance with federal and state regulations, be treated as hazardous medical waste and prohibit returning the excised tissue to the patient. 29 C.F.R. § 1910.1030 (bloodborne pathogens); §§ 260.200 R.S.Mo., 260.203 R.S.Mo. (infectious waste disposal); 10 C.S.R. § 80-7.101 (infectious waste management).
In early 2003, Dr. Catalona left WU for Northwestern University in Chicago, Illinois. He intended to continue his research in the area of prostate cancer. In connection with his anticipated departure and continuation of his research at Northwestern University; on or about February 18, 2003, he sent a letter to all research participants, whether or not they had been his patients, who had participated in his research protocols at WU. Catalona Exhibit HH. This letter informed these RPs of his departure from WU on or about February 24, 2003, of his continued availability for consultation and/or treatment, and his continuation for prostate cancer research. The letter was also included in a newsletter known as "Quest", published quarterly by the Urological Research Foundation, of which Dr. Catalona was the Medical Director. Dr. Catalona testified that he believed that approximately 60,000 people received his February 18th letter either directly or via the Quest newsletter. Tr. 2:32-33.
In apprising the recipients of the letter of his intention to continue his prostate cancer research, Dr. Catalona stated "[T]o succeed in these goals, I need to have the tissue and blood samples that patients, their relatives, and other research volunteers have contributed to me over the years. You have entrusted me with samples, and I have used them for collaborative research that will help in your future medical care and in the care of others for years to come." Attached to the February 18th letter was a "Medical Consent & Authorization" form stating:
"I have donated a tissue and/or blood sample for Dr. William J. Catalona's research studies. Please release all of my samples to Dr. Catalona at Northwestern University upon his request. I have entrusted these samples to Dr. Catalona to be used only at his direction and with his express consent for research projects."
The letter asks the recipient of the letter to sign this "authorization for release" form and return it promptly to Dr. Catalona. Catalona Exhibit HH. Approximately 6000 recipients signed the form and returned it to Dr. Catalona. Tr. 1:61; Tr. 1:101; Catalona Exhibit JJJJ.
At the time that Dr. Catalona sent the February 18, 2003 letter and release form, he was still an employee of WU. Furthermore, he was no longer the Principal Investigator on any of the research protocols involving the samples he sought to have transferred to Northwestern University. He had transferred the role of Principal Investigator on his remaining active research protocols to another WU faculty member/researcher, Dr. Brian K. Suarez. Plaintiff's Exhibit 29. The letter and release form was sent by Dr. Catalona without prior approval of any WU administrators or the approval of the HSC. At the time he sent the letter and release form, Dr. Catalona did not have any approved research protocol at Northwestern University nor had he obtained the approval of the Northwestern University IRB prior to sending the letter and release form.
In 2002 WU formed a Peer Review Panel to consider requests from researchers, both within WU and outside of WU, to obtain and use biological samples from the GU Biorepository. Prior to leaving WU, Dr. Catalona had submitted three (3) such requests, and all three (3) have been approved and the requested biological materials provided to him for his research. As *994 of the date of the hearing, Dr. Catalona had not made any additional requests for biological materials from the GU Biorepository to the Peer Review Panel for consideration.

Conclusions of Law
As stated previously, the sole issue determinative of this permanent injunction; in fact of this lawsuit; is the issue of ownership. That is, once having made voluntary donations of biological materials for medical research to a research institution, do the research participants retain ownership rights in such materials in that they can direct said materials' use and transfer to third-parties. WU argues that the RPs made voluntary donations; i.e. gifts, of biological materials and once these "gifts" were delivered to WU, WU became the sole owner with control as to use and storage (pursuant to applicable federal and state regulations). Dr. Catalona and the RPs argue that the RPs had donated their biological materials with the "intent" that such materials stay with Dr. Catalona for his research.[11] The RPs believe that they have retained ownership rights in their donated biological materials and can withdraw said materials and have them transferred to Dr. Catalona and/or Northwestern University via their discontinuation of participation in any research at WU and their signing of Dr. Catalona's consent form.
Missouri law governs the substantive issues of ownership and "gift/donation". It is well-settled that exclusive possession and control of personal property is prima facie evidence of ownership, and anyone else claiming such property bears the burden of proof. Foltz v. Pipes, 800 S.W.2d 14, 15 (Mo.App.1990); State v. Patchen, 652 S.W.2d 265, 267 (Mo.App. 1983). The burden by the non-possessor asserting an ownership interest is met only by a preponderance of the evidence. Foltz, at 15; Patchen, at 267.
It is undisputed that at all times WU has been in exclusive possession of the subject biological materials. WU has supplied all facilities housing the GU Biorepository. WU personnel has consistently maintained and administered the GU Biorepository. Although some funding of the GU Biorepository has been provided through Dr. Catalona's efforts, it was done so via his position at WU. The majority of funding for the GU Biorepository has been through the financial reserves of the Urology Division of the WU Medical School. It is undisputed that Dr. Catalona had access to the subject materials, but so did other researchers, both inside and outside of WU. Furthermore, such access was only through the IRB and HSC of WU. There was no evidence provided to this Court that any RP had access to his or her biological materials once such materials were made a part of the GU Biorepository.
WU had exclusive control over the subject biomaterials. As stated before, WU is solely responsible for deciding who can have access to the GU Repository and the use for such biomaterials. Even as Chief of the Urology Division, any decisions made by Dr. Catalona were made as a WU employee. WU alone bears all legal, regulatory, and compliance risks with respect to all research done in connection with the GU Biorepository. WU is a federally approved and regulated institution for the carrying out of human-subject research, for which the Biorepository was established. As such, it is continually responsible for ensuring that the GU Biorepository meets all necessary requirements; and *995 does this through audits and substantial internal compliance programs. Due to the nature of the GU Biorepository, WU is subject to federal and state laws and regulations governing the disposal and storage of human biological matter, and it alone is responsible for compliance with such laws and regulations. There was no evidence presented to this Court that any RP is equally responsible for the control of the use of these materials in human-subject research.
WU has continually asserted its ownership interests in the materials stored in the GU Biorepository. Its Intellectual Property Policy[12], in existence prior to this dispute arising, states that tangible research property, including biological materials, belong to WU if significant university resources were used or such property was obtained pursuant to a research project funded by an external sponsor administered by WU. Furthermore, in all MTAs concerning these materials, including those wherein Dr. Catalona was the "Provider's Scientist", WU clearly exerted its ownership interest without objection by Dr. Catalona.[13] Even in the instance wherein Dr. Catalona attempted to change the language of a MTA to reflect "co-ownership" with WU, and WU refused to modify the language in the MTA, Dr. Catalona still signed.[14]
There is little dispute as to the scarcity of legal precedent to assist the Court in addressing the situation that presently stands before the Court. The two (2) cases which provide the most guidance concluded that research participants retain no ownership of biological materials they contribute for medical research.[15]Greenberg, et al. v. Miami Children's Hospital Research Institute, Inc., et al., 264 F.Supp.2d 1064 (S.D.Fla.2003); Moore v. The Regents of the University of California, et. al., 51 Cal.3d 120, 793 P.2d 479, 271 Cal.Rptr. 146 (Ca.1990).
In Greenberg, supra, donors of human tissue and fluids (among others) sued the physician who received the biological materials, used them to isolate the gene causing Canavan disease, and then obtained patent and attempted to license the patent. The plaintiff donors claimed, among other things, that they had a property interest in their excised body tissue and in the genetic information extracted from such tissue; as well as the registry which contained the donors' personal and genetic information. They asserted that the defendant(s) had "converted" such information for the defendant(s)' own exclusive economic benefit. Id., at 1074. The Court held that it "disagrees and declines to find a property interest for the body tissue and genetic information voluntarily given to Defendants. These were donations to research without any contemporaneous expectations of return of the body tissue and genetic samples, and thus conversion does not lie as a cause of action." Id., at 1074.
After recognizing that a claim of conversion was first predicated upon an ownership interest, the Florida district court, in *996 adopting the reasoning of the Moore case, found that the plaintiff donors had no cognizable property interest in body tissue and genetic matter donated for medical research. Greenberg, at 1074. After reviewing Florida state court opinions regarding property rights and body tissue, as well as Florida statutes regarding genetic materials, the Florida district court found that "the property right in blood and tissue samples also evaporates once the sample is voluntarily given to a third party." Id., at 1075. It refused to recognize a claim of conversion because the blood and body tissue were "voluntary donations to medical research" and were donated "without any contemporaneous expectations of return." Id., at 1075-76.
In Moore, supra, a patient undergoing treatment for hairy-cell leukemia had portions of his removed spleen, and samples of his blood, blood serum, skin, bone marrow aspirate and sperm utilized in medical research without his knowledge and/or consent. This research resulted in a cell line which was patented by the defendants. The defendants ultimately entered into commercial agreements for the commercial development of the cell line and the resulting products. The patient plaintiff brought suit alleging conversion and breach of physician's disclosure obligations. As for his conversion claim,
"[H]e theorizes that he continued to own his cells following their removal from his body, at least for the purpose of directing their use, and that he never consented to their use in potentially lucrative medical research. Thus, to complete Moore's argument, defendants' unauthorized use of his cells constitutes a conversion. As a result of the alleged conversion, Moore claims a proprietary interest in each of the products that any of the defendants might ever create from his cells or the patented cell line."
Id., at 134-35, 271 Cal.Rptr. 146, 793 P.2d 479.[16]
The California Supreme Court did an exhaustive review of the law relating to the ownership and use of human biological materials. Having noted that Moore could not reasonably expect to retain possession of his excised cells, his claim for conversion had to rest upon retaining an ownership interest in them; however, the Court could find no reported judicial decision which would support a finding that he retained such an interest. Id., at 136-37, 271 Cal. Rptr. 146, 793 P.2d 479. Instead the Court found that the laws governing human tissues, blood, and other biological materials were better suited, than court cases dealing with the law of conversion, to deal with regulating their disposition. Id., at 137, 271 Cal.Rptr. 146, 793 P.2d 479. "It is these specialized statutes, not the law of conversion, to which courts ordinarily should and do look for guidance on the disposition of human biological materials." Id., at 137, 271 Cal.Rptr. 146, 793 P.2d 479. One of the things making Moore's ownership claim "problematic" for the California Supreme Court was California's statutory law which severely limits a patient's control over excised cells. Essentially, California's laws negate any ownership rights a patient may have to excised cells since such biological materials are considered to be potentially hazardous biological waste materials and have to be disposed by a method approved by the state to protect the public health and safety. Id., at 140, 271 Cal.Rptr. 146, 793 P.2d 479. Ultimately, the California Supreme Court refused to bestow ownership rights to the patient/plaintiff for several reasons, including *997 that it felt that even if a patient had "some limited right to control use of excised cells" such a "right" is already protected because "[A] fully informed patient may always withhold consent to treatment by a physician whose research plans the patient does not approve." Id., at 141, 271 Cal. Rptr. 146, 793 P.2d 479.
Both the Greenberg and the Moore cases found the research participant to be a "donor" who had parted with any semblance of ownership rights once their biological materials had been excised for medical research. Both courts reviewed relevant caselaw, addressed policy considerations, and addressed the implications of applicable federal and/or state laws dealing with biological materials. The Court finds their analysis to be persuasive, and in light of its own review of applicable Missouri law, finds that WU has met its burden in establishing ownership of the subject materials and that the RPs have not put forth adequate evidence to challenge WU's ownership claim.
Furthermore, the Court finds that the RPs are "donors" and the subject biological materials constitute an inter vivos gift. The elements of an inter vivos gift are: 1) present intention of the donor to make a gift; 2) delivery of property by donor to donee; and 3) acceptance by donee whose ownership takes effect immediately and absolutely. In re Harlan Jerome True, 285 B.R. 405, 413-14 (Bkrtcy. W.D.Mo.2002); Wantuck v. United Savings and Loan Assn., 461 S.W.2d 692, 694 (Mo.1971); In the Estate of Mary F. Campbell, 939 S.W.2d 558, 562 (Mo.App. 1997); Duvall v. Henke, 749 S.W.2d 714, 716 (Mo.App.1988). The person claiming that the gift exists has the burden of proving it with clear, cogent and convincing evidence. In re Harlan Jerome True, at 414; In the Estate of Mary F. Campbell, at 562; Duvall, at 716.
"Specific language is not required to reflect present intent to make a gift on the part of donor." Duvall, at 716. The circumstances surrounding the donation can create an inference that the donor had the present intent to make the inter vivos gift to the donee. Duvall, at 716. In fact, "[c]onduct can be an enlightening ingredient in discerning intent." In the Estate of Mary F. Campbell, at 562.
The RPs all signed informed consent forms that clearly stated that they were agreeing to participate in medical research studies at WU. Tr. 2:10. Many of the RPs were patients of WU doctors other than Dr. Catalona. Tr. 1:83 Many of the RPs donated biological materials for research protocols having someone other than Dr. Catalona as the Principal Investigator. Plaintiff's Exhibits 56, 57, 58, 59; Tr. 1:80-82; Tr. 2:94-97. The informed consent forms typically bore the WU Medical Center logo. The informed consent forms stated that they were not valid without the stamp of approval of the WU Human Studies Committee. The forms advised the RPs that they could contact the Chairman of the WU Human Studies Committee with any concerns. The forms advised the participants what WU would do to protect their privacy and minimize the burdens of participating in the study.
Nowhere in the forms were RPs advised that they were entrusting their samples to Dr. Catalona only. In fact, in those research protocols wherein Dr. Catalona was the Principal Investigator, the forms merely stated: "You are invited to participate in a research study conducted by Dr. William J. Catalona and/or colleagues." Plaintiff's Exhibits 27, 61, 98; Catalona Exhibits UUU (McGurk and Ellis informed consent forms); Patients' Exhibit 1Ward informed consent form.
The Court finds that the RPs had the present intent to make inter vivos gifts; *998 i.e. donations of their biological materials to WU for medical research.
Furthermore, the Court finds that for the reasons stated in establishing WU's ownership of the subject biological materials, WU took delivery of these materials and its acceptance of said materials immediately and absolutely effectuated WU's ownership of these materials.
Dr. Catalona and the RPs challenge WU's ownership rights by asserting the following grounds: 1) that no gift was made because of "exculpatory language" in the informed consent forms; 2) no gift was made to WU because the RPs "intended" for their samples to go with Dr. Catalona wherever he may go to conduct research; 3) that the RPs have retained their ownership rights to their excised biological materials because their "right to discontinue participation" includes a "right to control the samples' use" and a "right to transfer their samples" to a specific person or entity; 4) that the informed consents are invalid as being violative of certain ethical documents regarding human-subject research; and 5) the RPs made a bailment of their biological materials, not an inter vivos gift to WU. The Court has carefully reviewed each of these arguments and finds them meritless.
As stated before, an inter vivos gift only requires donative intent, delivery, and acceptance. There is no requirement that the gift be made pursuant to any written document. See, Ridenour v. Duncan, 246 S.W.2d 765, 769 (Mo.1952)("Language, written or spoken, expressing an intention to give does not constitute a gift unless the intention is executed by a complete and unconditional delivery of the subject matter or a delivery of a proper written instrument evidencing the gift."); In re Estate of Gladys Piper, 676 S.W.2d 897, 899 (Mo.App.1984)(citing Ridenour, supra.). Since delivery of the subject biological materials was made and accepted by WU, the existence of the informed consent forms in inconsequential.
However, because of the nature of the gift, federal regulations require some form of informed consent. Dr. Catalona and the RPs argue that the presence of "exculpatory language" invalidates the informed consents and therefore, negates the gifts. In support of this argument, they point to the OPRR guidance document (Defendant's Exhibit Q). As this Court has already determined, this document is not legally-binding upon WU. It merely presents an opinion by the OPRR regarding exculpatory language in informed consent forms and provides examples. These examples are not found in any of the federal regulations governing the GU Biorepository.
The governing federal regulation (as to informed consent), 45 C.F.R. § 46.116, only prohibits exculpatory language in the form of a waiver or release from liability.
"No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive any of the subject's legal rights, or releases or appears to release the investigation, the sponsor, the institution or its agents from liability for negligence."
It is clear that the only legal obligation WU had was not to include exculpatory language in its informed consent forms which waived any legal rights the RP may have or relieve any party from liability for negligence. Hearing testimony from all experts indicated that the research community consistently understood 45 C.F.R. § 46.116 to bar exculpatory language involving releases from malpractice or other negligence. The OPRR's opinion as to exculpatory language does not govern the informed consents and therefore, does not affect the ownership interest of WU in the materials stored in the GU Biorepository.
Next, Dr. Catalona and the RPs argue that the RPs never intended for WU *999 to have ownership rights to the donated biological materials; i.e. that their intent was to retain such rights and continue to exercise their ownership rights as to the use and location of their excised biological materials.
As stated earlier, one of the elements of a gift is present donative intent. Present donative intent is assessed by determining if a gift was intended at the time of the initial transaction. Michaelson v. Wolf, 364 Mo. 356, 261 S.W.2d 918, 925 (1953). A completed inter vivos gift cannot be revoked by the donor once the gift is delivered and accepted by the donee. Clippard v. Pfefferkorn, 168 S.W.3d 616, 619 (Mo. App.2005); Donnelly v. Donnelly, 951 S.W.2d 650, 653 (Mo.App.1997). "An afterthought of regret does not nullify the passage of title by a delivery and made by the grantor." LeMehaute, et. al. v. LeMehaute, 585 S.W.2d 276, 281 (Mo.App.1979).
The Court finds that the RPs had the present intent to donate their biological materials to WU to be maintained in the GU Repository. The informed consent forms repeatedly asserted WU's ownership of the donated materials and only listed Dr. Catalona as the Principal Investigator. Although the Court respects the testimony given by Messrs. Ward, Ellis, and McGurk, it was clear that these gentlemen all had a deep personal connection to Dr. Catalona, and believed that they owed their lives to him. The Court understands and appreciates these feelings but their testimony regarding intent, especially now after getting Dr. Catalona's letter, is suspect or at least, shows nothing more than an "afterthought of regret". There was no testimony by any of these gentlemen that they did not read nor understand the informed consent forms prior to signing. The forms spoke of "donation" and at least two (2) forms (Ward and McGurk) referenced a waiver of any claim to the excised body tissues. Since Ward, Ellis, and McGurk were presumably testifying on behalf of the eight (8) patients who joined the case, and reflect the opinion of all RPs who signed Dr. Catalona's "consent to transfer" form, the Court finds that all RPs who donated biological materials to the GU Repository, whether or not patients of Dr. Catalona, donated such materials with the present intent of making an inter vivos gift to WU.
Next, Dr. Catalona and the RPs argue that the RPs right to discontinue participation includes the right to continue control over the use and location of their excised biological materials. There is nothing stated in the governing federal regulations which equates a right to discontinue participation with a right to control the disposition and use of the excised biological materials. The relevant testimony at the hearing indicated that only three (3) things happen when a RP chooses to "discontinue participation": 1) WU may destroy the sample; 2) WU may store the sample indefinitely without any further use; or 3) WU may remove all identifying markers and use the sample in exempt "anonymized" research. Dr. Goodman and Dr. Clayton both agreed that research samples can be destroyed even without approval of the RP; and in fact, Dr. Catalona has done this on several occasions. No one questioned WU's ability to simply store the samples indefinitely after a RP discontinues participation in a research project. Finally, Drs. Ludbrook and Prentice both testified that anonymization is a response available to WU when a RP chooses to discontinue participation in research.[17]
*1000 The Court finds that the right to discontinue participation in a research project means nothing more that the RP has chosen not to provide any more biological materials pursuant to one or more research protocols; i.e., not to make any more inter vivos gifts of donated biological materials to WU. Nothing more can or should be read into this right possessed by the RPs at all times.
Next, Dr. Catalona and the RPs argue that WU's refusal to transfer the donated biological materials violates the Belmont Report, the Declaration of Helsinki, and the Nuremberg Code. The Belmont Report is the 1979 report of a Presidential Commission that summarizes the basic ethical principles underlying the conduct of biomedical and behavioral human subject research. Defendant's Exhibit MMMM. The Declaration of Helsinki is a statement of ethical principles to provide guidance to physicians in connection with human subject research. Defendant's Exhibit NNNN. The Nuremberg Code, developed as a result of the war criminal trials before the. Nuremberg Military Tribunals following World War II, and in response to the human experimentation experiments of Nazi Germany, similarly deals with ethical principles governing human subject research. Defendant's Exhibit 0000. All of these documents set forth international ethical principles relating to human subject research.
Although WU does have an agreement with DHHS to be guided by the ethical principles in the Belmont Report[18], said agreement fails to provide a basis for the claims of Dr. Catalona and/or the RPs wishing to transfer their samples (including the eight patients who are parties to this lawsuit) because they are not parties to or the third-party beneficiaries of this government contract. They have no private cause of action to enforce the terms of the contract. See, Wright v. Fred Hutchinson Cancer Research Center, 269 F.Supp.2d. 1286, 1290 (W.D.Wash.2002). Furthermore, the Court finds that Dr. Catalona and the RPs have failed to make an adequate showing that the refusal of WU to transfer the subject samples constitutes a violation of the DHHS Assurance Contract; and therefore, a violation of the Belmont Report.
There is no private right of action for an alleged violation of international law for the protection of human research subjects based upon the Declaration of Helsinki and the Nuremberg Code. White v. Paulsen, 997 F.Supp. 1380, 1383 (E.D.Wash.1998); Hoover v. West Virginia Dept. of Health and Human Resources, 984 F.Supp. 978, 980 (S.D.W.Va.1997) affd 129 F.3d 1259, 1997 WL 705385 (4th Cir. 1997); see also, Abdullahi, et al. v. Pfizer, Inc., 2005 WL 1870811 (S.D.N.Y.2005)[19]. Furthermore, this Court agrees with the conclusions reached by its fellow district courts in Michigan and Oklahoma that the standard in the United States for conducting research on human subjects is contained in the Code of Federal Regulations and therefore United States federal courts have no need to resort to international law to impute a standard. Ammend v. Bioport, Inc., 322 F.Supp.2d 848, 872-73 *1001 (W.D.Mich.2004); Robertson v. McGee, 2002 WL 535045 (N.D.Okla.2002).
Finally, Dr. Catalona and the RPs assert that the RPs did not make a "gift" of the subject biological materials but instead made a "bailment" and that WU stands only in the position as a bailee.[20] This argument fails for the simple reason that when a "gift" is made, the giftor/donor has no expectation of getting the "gift" back; however, when a "bailment" is made, the bailor has every expectation of receiving back the subject of the bailment. A bailment is made on the condition that the property (after delivery by bailor and acceptance by bailee) be restored to the bailor according to his/her directions as soon as the purpose for the bailment ceases. Seitz v. Lemay Bank & Trust Co., 959 S.W.2d 458, 461 (Mo.1998); Stone v. Crown Diversified Indus. Corp., at 669. There was no evidence presented to this Court that any of the RPs, including the three (e) RPs that testified, had ever informed WU, at the time of "delivery" of the subject biological materials that they wanted the samples returned to them. Furthermore, the RPs could not have had a reasonable expectation of restoration of the subject biological materials to them because applicable federal and state regulations governing the disposal of medical waste prohibit the return of such biological materials to the RPs. See, 29 C.F.R. § 1910.1030; §§ 260.200, 260.203 R.S.Mo.; 10 C.S.R. § 80-7.010.
Finally, the medical research community itself has never considered the relationship between an RP and a medical research institution to be one of bailment. All the experts testified that they knew of no instance wherein a research participant had his/her samples returned to them. Even Dr. Catalona testified that he could only recall one or two instances wherein a biological sample had been returned to a patient, for clinical purposes.[21] The Court finds that no implied bailment existed, at any time, in connection with any RP, as to the samples stored in the GU Repository between an RP and WU.
In connection with their argument that the RPs "own" their excised biological materials and can transfer them to any institution or person of their choosing, Dr. Catalona advances the notion that his letter and "Medical Consent and Authorization" form allegedly signed by approximately 6000 RPs effectively legally carries out the RPs'"right to discontinue participation". However, one views this document(s), it in no. way provides a legal vehicle by which any RP can "discontinue participation" in any research protocol at WU.
Every expert and even Dr. Catalona testified that the letter/form did not constitute "informed consent" pursuant to the applicable federal regulations. It was never submitted to any IRB, either at WU or Northwestern University, for prior approval. Contrary to Dr. Catalona's opinion, the Court finds that his communication to the RPs was a "change" to his research protocols. He was no longer the Principal Investigator on any of the studies involving the samples he sought to have transferred; he was no longer an employee of WU nor continuing to conduct his *1002 research at WU, and Northwestern University (at that time) had not approved any "new" research protocols for him which would involve use of the biological materials he wanted transferred. Furthermore, the context in which this form was sent is troubling to the Court. He sent it to RPs, many of whom were his patients and emotionally tied to him, advising them of his move, of his desire to continue his consultation/treatment practice, and then describing his need to use these samples to further his help to them. Such a communication smacks of undue influence. Quite simply, the letter and form did not act in any legal authoritative manner to effectuate a transfer of the subject biological materials as part of a RP's right to discontinue participation.
As a final note, the Court wishes to address the possible (if not, probable) public policy ramifications of Dr. Catalona and the RP's position. The amicus brief filed by the Association of American Medical Colleges[22] succinctly mirrors the Court's concerns. Currently, these materials are housed and maintained by institutions federally and state regulated. A "check and balance" system is in place to monitor the research being conducted using these materials. The safety and welfare of human subject participants is protected through a variety of legal and professional standards administered by committees of persons schooled in the fields most privy to the needs of the medical/science community. Medical research can only advance if access to these materials to the scientific community is not thwarted by private agendas. If left unregulated and to the whims of a RP, these highly-prized biological materials would become nothing more than chattel going to the highest bidder. It would no longer be a question of the importance of the research protocol to public health, but rather who can pay the most. Selling excised tissue or DNA on E-Bay would become as commonplace as selling your old television on E-Bay. The integrity and utility of all biorepositories would be seriously threatened if RPs could move their samples from institution to institution any time they wanted. No longer could research protocols rely on aggregate collections since individual samples would come and go. Accountability would no longer exist since institutions would merely be warehouses filling purchase orders.
More alarming is the great potential for prejudicial influences into medical research. Allowing an RP to choose who can have the sample, where the sample will be stored, and/or how the sample can be used is tantamount to a blood donor being able to dictate that his/her blood can only be transfused into a person of a certain ethnic background, or a donated kidney being transplanted only into a woman or man. This kind of "selectiveness" is repugnant to any ethical code which promotes medical research to help all of mankind.
Accordingly, the Court finds that 1) defendants; i.e. Dr. William Catalona and the eight (8) research participants who are parties to this action, have failed to demonstrate that they are entitled to any injunctive relief; 2) that plaintiff Washington University owns all biological materials, including but not limited to blood, tissue, and DNA samples, in the GU Repository; 3) that neither Dr. William Catalona nor any research participant in connection with any research protocol conducted under the auspices of Washington University has any ownership or proprietary interest in the biological samples housed in the GU Repository; and 4) that the "Medical Consent & Authorization" forms authored by Dr. William Catalona and either directly or indirectly delivered to any research participant and signed by any research participant *1003 are void and ineffective to transfer ownership and/or possession of any biological samples housed in the GU Repository to Dr. William Catalona, Northwestern University, any other research facility/institution, or any or all research participants.[23]

Attachment A

PART 46PROTECTION OF HUMAN SUBJECTS
Subpart ABasic HHS Policy for Protection of Human Research Subjects
Sec.
46.101 To what does this policy apply?
46.102 Definitions.
46.103 Assuring compliance with this policyresearch conducted or supported by any Federal Department or Agency.
46.104-46.106 [Reserved]
46.107 IRB membership.
46.108 IRB functions and operations.
46.109 IRB review of research.
46.110 Expedited review procedures for certain kinds of research involving no more than minimal risk, and for minor changes in approved research.
46.111 Criteria for IRB approval of research.
46.112 Review by institution.
46.113 Suspension or termination of IRB approval of research.
46.114 Cooperative research.
46.115 IRB records.
46.116 General requirements for informed consent.
46.117 Documentation of informed consent.
46.118 Applications and proposals lacking definite plans for involvement of human subjects.
46.119 Research undertaken without the intention of involving human subjects.
46.120 Evaluation and disposition of applications and proposals for research to be conducted or supported by a Federal Department or Agency.
46.121 [Reserved]
46.122 Use of Federal funds.
46.123 Early termination of research support: Evaluation of applications and proposals.
46.124 Conditions.

Subpart BAdditional Protections for Pregnant Women, Human Fetuses and Neonates Involved in Research
46.201 To what do these regulations apply?
46.202 Definitions.
46.203 Duties of IRBs in connection with research involving pregnant women, fetuses, and neonates.
46.204 Research involving pregnant women or fetuses.
46.205 Research involving neonates.
46.206 Research involving, after delivery, the placenta, the dead fetus or fetal material.
46.207 Research not otherwise approvable which presents an opportunity to understand, prevent, or alleviate a serious problem affecting the health or welfare of pregnant women, fetuses, or neonates.
*1004 Subpart CAdditional Protections Pertaining to Biomedical and Behavioral Research Involving Prisoners as Subjects
46.301 Applicability.
46.302 Purpose.
46.303 Definitions.
46.304 Composition of Institutional Review Boards where prisoners are involved.
46.305 Additional duties of the Institutional Review Boards where prisoners are involved.
46.306 Permitted research involving prisoners.

Subpart DAdditional Protections for Children Involved as Subjects in Research
46.401 To what do these regulations apply?
46.402 Definitions.
46.403 IRB duties.
46.404 Research not involving greater than minimal risk.
46.405 Research involving greater than minimal risk but presenting the prospect of direct benefit to the individual subjects.
46.406 Research involving greater than minimal risk and no prospect of direct benefit to individual subjects, but likely to yield generalizable knowledge about the subject's disorder or condition.
46.407 Research not otherwise approvable which presents an opportunity to understand, prevent, or alleviate a serious problem affecting the health or welfare of children.
46.408 Requirements for permission by parents or guardians and for assent by children.
46.409 Wards.
AUTHORITY: 5 U.S.C. 301; 42 U.S.C. 289(a).
EDITORIAL NOTE: The Department of Health and Human Services issued a notice of waiver regarding the requirements set forth in part 46, relating to protection of human subjects, as they pertain to demonstration projects, approved under section 1115 of the Social Security Act, which test the use of costsharing, such as deductibles, copayment and coinsurance, in the Medicaid program. For further information see 47 FR 9206, Mar. 4, 1982.
Subpart ABasic HHS Policy for Protection of Human Research Subjects
AUTHORITY: 5 U.S.C. 301; 42 U.S.C. 289, 42 U.S.C. 300v-1(b).
SOURCE: 56 FR 28012, 28022, June 18, 1991, unless otherwise noted.
§ 46.101 To what does this policy apply?
(a) Except as provided in paragraph (b) of this section, this policy applies to all research involving human subjects conducted, supported or otherwise subject to regulation by any federal department or agency which takes appropriate administrative action to make the policy applicable to such research. This includes research conducted by federal civilian employees or military personnel, except that each department or agency head may adopt such procedural modifications as may be appropriate from an administrative standpoint. It also includes research conducted, supported, or otherwise subject to regulation by the federal government outside the United States.
(1) Research that is conducted or supported by a federal department or agency, whether or not it is regulated as defined in § 46.102(e), must comply with all sections of this policy.
(2) Research that is neither conducted nor supported by a federal department or *1005 agency but is subject to regulation as defined in § 46.102(e) must be reviewed and approved, in compliance with § 46.101, § 46.102, and § 46.107 through § 46.117 of this policy, by an institutional review board (IRB) that operates in accordance with the pertinent requirements of this policy.
(b) Unless otherwise required by department or agency heads, research activities in which the only involvement of human subjects will be in one or more of the following categories are exempt from this policy:
(1) Research conducted in established or commonly accepted educational settings, involving normal educational practices, such as (i) research on regular and special education instructional strategies, or (ii) research on the effectiveness of or the comparison among instructional techniques, curricula, or classroom management methods.
(2) Research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures or observation of public behavior, unless:
(i) Information obtained is recorded in such a manner that human subjects can be identified, directly or through identifiers linked to the subjects; and (ii) any disclosure of the human subjects' responses outside the research could reasonably place the subjects at risk of criminal or civil liability or be damaging to the subjects' financial standing, employability, or reputation.
(3) Research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures, or observation of public behavior that is not exempt under paragraph (b)(2) of this section, if:
(i) The human subjects are elected or appointed public officials or candidates for public office; or (ii) federal statute(s) require(s) without exception that the confidentiality of the personally identifiable information will be maintained throughout the research and thereafter.
(4) Research, involving the collection or study of existing data, documents, records, pathological specimens, or diagnostic specimens, if these sources are publicly available or if the information is recorded by the investigator in such a manner that subjects cannot be identified, directly or through identifiers linked to the subjects.
(5) Research and demonstration projects which are conducted by or subject to the approval of department or agency heads, and which are designed to study, evaluate, or otherwise examine:
(i) Public benefit or service programs; (ii) procedures for obtaining benefits or services under those programs; (iii) possible changes in or alternatives to those programs or procedures; or (iv) possible changes in methods or levels of payment for benefits or services under those programs.
(6) Taste and food quality evaluation and consumer acceptance studies, (i) if wholesome foods without additives are consumed or (ii) if a food is consumed that contains a food ingredient at or below the level and for a use found to be safe, or agricultural chemical or environmental contaminant at or below the level found to be safe, by the Food and Drug Administration or approved by the Environmental Protection Agency or the Food Safety and Inspection Service of the U.S. Department of Agriculture.
(c) Department or agency heads retain final judgment as to whether a particular activity is covered by this policy.
(d) Department or agency heads may require that specific research activities or classes of research activities conducted, *1006 supported, or otherwise subject to regulation by the department or agency but not otherwise covered by this policy, comply with some or all of the requirements of this policy.
(e) Compliance with this policy requires compliance with pertinent federal laws or regulations which provide additional protections for human subjects.
(f) This policy does not affect any state or local laws or regulations which may otherwise be applicable and which provide additional protections for human subjects.
(g) This policy does not affect any foreign laws or regulations which may otherwise be applicable and which provide additional protections to human subjects of research.
(h) When research covered by this policy takes place in foreign countries, procedures normally followed in the foreign countries to protect human subjects may differ from those set forth in this policy. [An example is a foreign institution which complies with guidelines consistent with the World Medical Assembly Declaration (Declaration of Helsinki amended 1989) issued either by sovereign states or by an organization whose function for the protection of human research subjects is internationally recognized.] In these circumstances, if a department or agency head determines that the procedures prescribed by the institution afford protections that are at least equivalent to those provided in this policy, the department or agency head may approve the substitution of the foreign procedures in lieu of the procedural requirements provided in this policy. Except when otherwise required by statute, Executive Order, or the department or agency head, notices of these actions as they occur will be published in the FEDERAL REGISTER or will be otherwise published as provided in department or agency procedures.
(i) Unless otherwise required by law, department or agency heads may waive the applicability of some or all of the provisions of this policy to specific research activities or classes of research activities otherwise covered by this policy. Except when otherwise required by statute or Executive Order, the department or agency head shall forward advance notices of these actions to the Office for Protection from Research Risks, Department of Health and Human Services (HHS), and shall also publish them in the FEDERAL REGISTER or in such other manner as provided in department or agency procedures.[1]
[56 FR 28012, 28022, June 18, 1991; 58 FR 29756, June 28, 1991]
§ 46.102 Definitions.
(a) Department or agency head means the head of any federal department or agency and any other officer or employee of any department or agency to whom authority has been delegated.
(b) Institution means any public or private entity or agency (including federal, state, and other agencies).
*1007 (c) Legally authorized representative means an individual or judicial or other body authorized under applicable law to consent on behalf of a prospective subject to the subject's participation in the procedure(s) involved in the research.
(d) Research means a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Activities which meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program which is considered research for other purposes. For example, some demonstration and service programs may include research activities.
(e) Research subject to regulation, and similar terms are intended to encompass those research activities for which a federal department or agency has specific responsibility for regulating as a research activity, (for example, Investigational New Drug requirements administered by the Food and Drug Administration). It does not include research activities which are incidentally regulated by a federal department or agency solely as part of the department's or agency's broader responsibility to regulate certain types of activities whether research or non-research in nature (for example, Wage and Hour requirements administered by the Department of Labor).
(f) Human subject means a living individual about whom an investigator (whether professional or student) conducting research obtains
(1) Data through intervention or interaction with the individual, or
(2) Identifiable private information.
Intervention includes both physical procedures by which data are gathered (for example, venipuncture) and manipulations of the subject or the subject's environment that are performed for research purposes. Interaction includes communication or interpersonal contact between investigator and subject. Private information includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information which has been provided for specific purposes by an individual and which the individual can reasonably expect will not be made public (for example, a medical record). Private information must be individually identifiable (i.e., the identity of the subject is or may readily be ascertained by the investigator or associated with the information) in order for obtaining the information to constitute research involving human subjects.
(g) IRB means an institutional review board established in accord with and for the purposes expressed in this policy.
(h) IRB approval means the determination of the IRB that the research has been reviewed and may be conducted at an institution within the constraints set forth by the IRB and by other institutional and federal requirements.
(i) Minimal risk means that the probability and magnitude of harm or discomfort anticipated in the research are not greater in and of themselves than those ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests.
(j) Certification means the official notification by the institution to the supporting department or agency, in accordance with the requirements of this policy, that a research project or activity involving human subjects has been reviewed and approved by an IRB in accordance with an approved assurance.
*1008 § 46.103 Assuring compliance with this policyresearch conducted or supported by any Federal Department or Agency.
(a) Each institution engaged in research which is covered by this policy and which is conducted or supported by a federal department or agency shall provide written assurance satisfactory to the department or agency head that it will comply with the requirements set forth in this policy. In lien of requiring submission of an assurance, individual department or agency heads shall accept the existence of a current assurance, appropriate for the research in question, on file with the Office for Protection from Research Risks, HHS, and approved for federalwide use by that office. When the existence of an HHS approved assurance is accepted in lieu of requiring submission of an assurance, reports (except certification) required by this policy to be made to department and agency heads shall also be made to the Office for Protection from Research Risks, HHS.
(b) Departments and agencies will conduct or support research covered by this policy only if the institution has an assurance approved as provided in this section, and only if the institution has certified to the department or agency head that the research has been reviewed and approved by an IRB provided for in the assurance, and will be subject to continuing review by the IRB. Assurances applicable to federally supported or conducted research shall at a minimum include:
(1) A statement of principles governing the institution in the discharge of its responsibilities for protecting the rights and welfare of human subjects of research conducted at or sponsored by the institution, regardless of whether the research is subject to federal regulation. This may include an appropriate existing code, declaration, or statement of ethical principles, or a statement formulated by the institution itself. This requirement does not preempt provisions of this policy applicable to department- or agency-supported or regulated research and need not be applicable to any research exempted or waived under § 46.101(b) or (i).
(2) Designation of one or more IRBs established in accordance with the requirements of this policy, and for which provisions are made for meeting space and sufficient staff to support the IRB's review and recordkeeping duties.
(3) A list of IRB members identified by name; earned degrees; representative capacity; indications of experience such as board certifications, licenses, etc., sufficient to describe each member's chief anticipated contributions to IRB deliberations; and any employment or other relationship between each member and the institution; for example: full-time employee, part-time employee, member of governing panel or board, stockholder, paid or unpaid consultant. Changes in IRB membership shall be reported to the department or agency head, unless in accord with § 46.103(a) of this policy, the existence of an HHS-approved assurance is accepted. In this case, change in IRB membership shall be reported to the Office for Protection from Research Risks, HHS.
(4) Written procedures which the IRB will follow (i) for conducting its initial and continuing review of research and for reporting its findings and actions to the investigator and the institution; (ii) for determining which projects require review more often than annually and which projects need verification from sources other than the investigators that no material changes have occurred since previous IRB review; and (iii) for ensuring prompt reporting to the IRB of [proposed changes in a research activity] and for ensuring that *1009 such changes in approved research, during the period for which IRB approval has already been given, may not be initiated without IRB review and approval except when necessary to eliminate apparent immediate hazards to the subject.
(5) Written procedures for ensuring prompt reporting to the IRB, appropriate institutional officials, and the department or agency head of (i) any unanticipated problems involving risks to subjects or others or any serious or continuing noncompliance with this policy or the requirements or determinations of the IRB and (ii) any suspension or termination of IRB approval.
(c) The assurance shall be executed by an individual authorized to act for the institution and to assume on behalf of the institution the obligations imposed by this policy and shall be filed in such form and manner as the department or agency head prescribes.
(d) The department or agency head will evaluate all assurances submitted in accordance with this policy through such officers and employees of the department or agency and such experts or consultants engaged for this purpose as the department or agency head determines to be appropriate. The department or agency head's evaluation will take into consideration the adequacy of the proposed IRB in light of the anticipated scope of the institution's research activities and the types of subject populations likely to be involved, the appropriateness of the proposed initial and continuing review procedures in light of the probable risks, and the size and complexity of the institution.
(e) On the basis of this evaluation, the department or agency head may approve or disapprove the assurance, or enter into negotiations to develop an approvable one. The department or agency head may limit the period during which any particular approved assurance or class of approved assurances shall remain effective or otherwise condition or restrict approval.
(f) Certification is required when the research is supported by a federal department or agency and not otherwise exempted or waived under § 46.101(b) or (i). An institution with an approved assurance shall certify that each application or proposal for research covered by the assurance and by § 46.103 of this Policy has been reviewed and approved by the IRB. Such certification must be submitted with the application or proposal or by such later date as may be prescribed by the department or agency to which the application or proposal is submitted. Under no condition shall research covered by § 46.103 of the Policy he supported prior to receipt of the certification that the research has been reviewed and approved by the IRB. Institutions without an approved assurance covering the research shall certify within 30 days after receipt of a request for such a certification from the department or agency, that the application or proposal has been approved by the IRB. If the certification is not submitted within these time limits, the application or proposal may be returned to the institution.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
[56 FR 28012, 28022, June 18, 1991; 56 FR 29756, June 28, 1991]
§§ 46.104-46.106 [Reserved]
§ 46.107 IRB membership.
(a) Each IRB shall have at least five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution. The IRB shall be sufficiently qualified through the experience and expertise of its members, and the *1010 diversity of the members, including consideration of race, gender, and cultural backgrounds and sensitivity to such issues as community attitudes, to promote respect for its advice and counsel in safeguarding the rights and welfare of human subjects. In addition to possessing the professional competence necessary to review specific research activities, the IRB shall be able to ascertain the acceptability of proposed research in terms of institutional commitments and regulations, applicable law, and standards of professional conduct and practice. The IRB shall therefore include persons knowledgeable in these areas. If an IRB regularly reviews research that involves a vulnerable category of subjects, such as children, prisoners, pregnant women, or handicapped or mentally disabled persons, consideration shall be given to the inclusion of one or more individuals who are knowledgeable about and experienced in working with these subjects.
(b) Every nondiscriminatory effort will be made to ensure that no IRB consists entirely of men or entirely of women, including the institution's consideration of qualified persons of both sexes, so long as no selection is made to the IRB on the basis of gender. No IRB may consist entirely of members of one profession.
(c) Each IRB shall include at least one member whose primary concerns are in scientific areas and at least one member whose primary concerns are in nonscientific areas.
(d) Each IRB shall include at least one member who is not otherwise affiliated with the institution and who is not part of the immediate family of a person who is affiliated with the institution.
(e) No IRB may have a member participate in the IRB's initial or continuing review of any project in which the member has a conflicting interest, except to provide information requested by the IRB.
(f) An IRB may, in its discretion, invite individuals with competence in special areas to assist in the review of issues which require expertise beyond or in addition to that available on the IRB. These individuals may not vote with the IRB.
§ 46.108 IRB functions and operations.
In order to fulfill the requirements of this policy each IRB shall:
(a) Follow written procedures in the same detail as described in § 46.103(b)(4) and, to the extent required by, § 46.103(b)(5).
(b) Except when an expedited review procedure is used (see § 46.110), review proposed research at convened meetings at which a majority of the members of the IRB are present, including at least one member whose primary concerns are in nonscientific areas. In order for the research to be approved, it shall receive the approval of a majority of those members present at the meeting.
§ 46.109 IRB review of research.
(a) An IRB shall review and have authority to approve, require modifications in (to secure approval), or disapprove all research activities covered by this policy.
(b) An IRB shall require that information given to subjects as part of informed consent is in accordance with § 46.116. The IRB may require that information, in addition to that specifically mentioned in § 46.116, be given to the subjects when in the IRB's judgment the information would meaningfully add to the protection of the rights and welfare of subjects.
(c) An IRB shall require documentation of informed consent or may waive documentation in accordance with § 46.117.
(d) An IRB shall notify investigators and the institution in writing of its decision to approve or disapprove the proposed re *1011 search activity, or of modifications required to secure IRB approval of the research activity. If the IRB decides to disapprove a research activity, it shall include in its written notification a statement of the reasons for its decision and give the investigator an opportunity to respond in person or in writing.
(e) An IRB shall conduct continuing review of research covered by this policy at intervals appropriate to the degree of risk, but not less than once per year, and shall have authority to observe or have a third party observe the consent process and the research.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
§ 46.110 Expedited review procedures for certain kinds of research involving no more than minimal risk, and for minor changes in approved research.
(a) The Secretary, HHS, has established, and published as a Notice in the FEDERAL REGISTER, a list of categories of research that may be reviewed by the IRB through an expedited review procedure. The list will be amended, as appropriate after consultation with other departments and agencies, through periodic' republication by the Secretary, HHS, in the FEDERAL REGISTER. A copy of the list is available from the Office for Protection from Research Risks, National Institutes of Health, HHS, Bethesda, Maryland 20892.
(b) An IRB may use the expedited review procedure to review either or both of the following:
(1) Some or all of the research appearing on the list and found by the reviewer(s) to involve no more than minimal risk,
(2) Minor changes in previously approved research during the period (of one year or less) for which approval is authorized.
Under an expedited review procedure, the review may be carried out by the IRB chairperson or by one or more experienced reviewers designated by the chairperson from among members of the IRB. In reviewing the research, the reviewers may exercise all of the authorities of the IRB except that the reviewers may not disapprove the research. A research activity may be disapproved only after review in accordance with the non-expedited procedure set forth in § 46.108(b).
(c) Each IRB which uses an expedited review procedure shall adopt a method for keeping all members advised of research proposals which have been approved under the procedure.
(d) The department or agency head may restrict, suspend, terminate, or choose not to authorize an institution's or IRB's use of the expedited review procedure.
§ 46.111 Criteria for IRB approval of research.
(a) In order to approve research covered by this policy the IRB shall determine that all of the following requirements are satisfied:
(1) Risks to subjects are minimized: (i) By using procedures which are consistent with sound research design and which do not unnecessarily expose subjects to risk, and (ii) whenever appropriate, by using procedures already being performed on the subjects for diagnostic or treatment purposes.
(2) Risks to subjects are reasonable in relation to anticipated benefits, if any, to subjects, and the importance of the knowledge that may reasonably be expected to result. In evaluating risks and benefits, the IRB should consider only those risks and benefits that may result from the research *1012 (as distinguished from risks and benefits of therapies subjects would receive even if not participating in the research). The IRB should not consider possible long-range effects of applying knowledge gained in the research (for example, the possible effects of the research on public policy) as among those research risks that fall within the purview of its responsibility.
(3) Selection of subjects is equitable. In making this assessment the IRB should take into account the purposes of the research and the setting in which the research will be conducted and should be particularly cognizant of the special problems of research involving vulnerable populations, such as children, prisoners, pregnant women, mentally disabled persons, or economically or educationally disadvantaged persons.
(4) Informed consent will be sought from each prospective subject or the subject's legally authorized representative, in accordance with, and to the extent required by § 46.116.
(5) Informed consent will be appropriately documented, in accordance with, and to the extent required by § 46.117.
(6) When appropriate, the research plan makes adequate provision for monitoring the data collected to ensure the safety of subjects.
(7) When appropriate, there are adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data.
(b) When some or all of the subjects are likely to be vulnerable to coercion or undue influence, such as children, prisoners, pregnant women, mentally disabled persons, or economically or educationally disadvantaged persons, additional safeguards have been included in the study to protect the rights and welfare of these subjects.
§ 46.112 Review by institution.
Research covered by this policy that has been approved by an IRB may be subject to further appropriate review and approval or disapproval by officials of the institution. However, those officials may not approve the research if it has not been approved by an IRB.
§ 46.113 Suspension or termination of IRB approval of research.
An IRB shall have authority to suspend or terminate approval of research that is not being conducted in accordance with the IRB's requirements or that has been associated with unexpected serious harm to subjects. Any suspension or termination of approval shall include a statement of the reasons for the IRB's action and shall be reported promptly to the investigator, appropriate institutional officials, and the department or agency head.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
§ 46.114 Cooperative research.
Cooperative research projects are those projects covered by this policy which involve more than one institution. In the conduct of cooperative research projects, each institution is responsible for safeguarding the rights and welfare of human subjects and for complying with this policy. With the approval of the department or agency head, an institution participating in a cooperative project may enter into a joint review arrangement, rely upon the review of another qualified IRB, or make similar arrangements for avoiding duplication of effort.
§ 46.115 IRB records.
(a) An institution, or when appropriate an IRB, shall prepare and maintain adequate *1013 documentation of IRB activities, including the following:
(1) Copies of all research proposals reviewed, scientific evaluations, if any, that accompany the proposals, approved sample consent documents, progress reports submitted by investigators, and reports of injuries to subjects.
(2) Minutes of IRB meetings which shall be in sufficient detail to show attendance at the meetings; actions taken by the IRB; the vote on these actions including the number of members voting for, against, and abstaining; the basis for requiring changes in or disapproving research; and a written summary of the discussion of controverted issues and their resolution.
(3) Records of continuing review activities.
(4) Copies of all correspondence between the IRB and the investigators.
(5) A list of IRB members in the same detail as described is § 46.103(b)(3).
(6) Written procedures for the IRB in the same detail as described in § 46.103(b)(4) and § 46.103(b)(5).
(7) Statements of significant new findings provided to subjects, as required by § 46.116(b)(5).
(b) The records required by this policy shall be retained for at least 3 years, and records relating to research which is conducted shall be retained for at least 3 years after completion of the research. All records shall be accessible for inspection and copying by authorized representatives of the department or agency at reasonable times and in a reasonable manner.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
§ 46.116 General requirements for informed consent.
Except as provided elsewhere in this policy, no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. (An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate) and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative (No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal rights, or releases or appears to release the investigator, the sponsor, the institution or its agents from liability for negligence.)
(a) Basic elements of informed consent. Except as provided in paragraph (c) or (d) of this section, in seeking informed consent the following information shall be provided to each subject:
(1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental;
(2) A description of any reasonably foreseeable risks or discomforts to the subject;
(3) A description of any benefits to the subject or to others which may reasonably be expected from the research;
*1014 (4) A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject;
(5) A statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained;
(6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained;
(7) An explanation of whom to contact for answers to pertinent questions about the research and research subjects' rights, and whom to contact in the event of a research-related injury to the subject; and
(8) A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and [the subject may discontinue participation at any time] without penalty or loss of benefits to which the subject is otherwise entitled.
(b) Additional elements of informed consent. When appropriate, one or more of the following elements of information shall also be provided to each subject:
(1) A statement that the particular treatment or procedure may involve risks to the subject (or to the embryo or fetus, if the subject is or may become pregnant) which are currently unforeseeable;
(2) Anticipated circumstances under which the subject's participation may be terminated by the investigator without regard to the subject's consent;
(3) Any additional costs to the subject that may result from participation in the research;
(4) The consequences of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject;
(6) A statement that significant new findings developed during the course of the research which may relate to the subject's willingness to continue participation will be provided to the subject; and
(5) A statement that significant new findings developed during the course of the research which may relate to the subject's willingness to continue participation will be provided to the subject; and
(6) The approximate number of subjects involved in the study.
(c) An IRB may approve a consent procedure which does not include, or which alters, some or all of the elements of informed consent set forth above, or waive the requirement to obtain informed consent provided the IRB finds and documents that:
(1) The research or demonstration project is to be conducted by or subject to the approval of state or local government officials and is designed to study, evaluate, or otherwise examine: (i) Public benefit of service programs; (ii) procedures for obtaining benefits or services under those programs; (iii) possible changes in or alternatives to those programs or procedures; or (iv) possible changes in methods or levels of payment for benefits or services under those programs; and
(2) The research could not practicably be carried out without the waiver or alteration.
(d) An IRB may approve a consent procedure which does not include, or which alters, some or all of the elements of informed consent set forth in this section, or waive the requirements to obtain informed consent provided the IRB finds and documents that:
*1015 (1) The research involves no more than minimal risk to the subjects;
(2) The waiver or alteration will not adversely affect the rights and welfare of the subjects;
(3) The research could not practicably be carried out without the waiver or alteration; and
(4) Whenever appropriate, the subjects will be provided with additional pertinent information after participation.
(e) The informed consent requirements in this policy are not intended to preempt any applicable federal, state, or local laws which require additional information to be disclosed in order for informed consent to be legally effective.
(f) Nothing in this policy is intended to limit the authority of a physician to provide emergency medical care, to the extent the physician is permitted to do so under applicable federal, state, or local law.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
§ 46.117 Documentation of informed consent.
(a) Except as provided in paragraph (c) of this section, informed consent shall be documented by the use of a written consent form approved by the IRB and signed by the subject or the subject's legally authorized representative. A copy shall be given to the person signing the form.
(b) Except as provided in paragraph (c) of this section, the consent form may be either of the following:
(1) A written consent document that embodies the elements of informed consent required by § 46.116. This form may be read to the subject or the subject's legally authorized representative, but in any event, the investigator shall give either the subject or the representative adequate opportunity to read it before it is signed; or
(2) A short form written consent document stating that the elements of informed consent required by § 46.116 have been presented orally to the subject or the subject's legally authorized representative. When this method is used, there shall be a witness to the oral presentation. Also, the IRB shall approve a written summary of what is to be said to the subject or the representative. Only the short form itself is to be signed by the subject or the representative. However, the witness shall sign both the short form and a copy of the summary, and the person actually obtaining consent shall sign a copy of the summary. A copy of the summary shall be given to the subject or the representative, in addition to a copy of the short form.
(c) An IRB may waive the requirement for the investigator to obtain a signed consent form for some or all subjects if it finds either:
(1) That the only record linking the subject and the research would be the consent document and the principal risk would be potential harm resulting from a breach of confidentiality. Each subject will be asked whether the subject wants documentation linking the subject with the research, and the subject's wishes will govern; or
(2) That the research presents no more than minimal risk of harm to subjects and involves no procedures for which written consent is normally required outside of the research context.
In cases in which the documentation requirement is waived, the IRB may require the investigator to provide subjects with a written statement regarding the research.
*1016 (Approved by the Office of Management and Budget under control number XXXX-XXXX)
§ 46.118 Applications and proposals lacking definite plans for involvement of human subjects.
Certain types of applications for grants, cooperative agreements, or contracts are submitted to departments or agencies with the knowledge that subjects may be involved within the period of support, but definite plans would not normally be set forth in the application or proposal. These include activities such as institutional type grants when selection of specific projects is the institution's responsibility; research training grants in which the activities involving subjects remain to be selected; and projects in which human subjects' involvement will depend upon completion of instruments, prior animal studies, or purification of compounds. These applications need not be reviewed by an IRB before an award may be made. However, except for research exempted or waived under § 46.101(b) or (i), no human subjects may be involved in any project supported by these awards until the project has been reviewed and approved by the IRB, as provided in this policy, and certification submitted, by the institution, to the department or agency.
§ 46.119 Research undertaken without the intention of involving human subjects.
In the event research is undertaken without the intention of involving human subjects, but it is later proposed to involve human subjects in the research, the research shall first be reviewed and approved by an IRB, as provided in this policy, a certification submitted, by the institution, to the department or agency, and final approval given to the proposed change by the department or agency.
§ 46.120 Evaluation and disposition of applications and proposals for research to be conducted or supported by a Federal Department or Agency.
(a) The department or agency head will evaluate all applications and proposals involving human subjects submitted to the department or agency through such officers and employees of the department or agency and such experts and consultants as the department or agency head determines to be appropriate. This evaluation will take into consideration the risks to the subjects, the adequacy of protection against these risks, the potential benefits of the research to the subjects and others, and the importance of the knowledge gained or to be gained.
(b) On the basis of this evaluation, the department or agency head may approve or disapprove the application or proposal, or enter into negotiations to develop an approvable one.
§ 46.121 [Reserved]
§ 46.122 Use of Federal funds.
Federal funds administered by a department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied.
§ 46.123 Early termination of research support: Evaluation of applications and proposals.
(a) The department or agency head may require that department or agency support for any project be terminated or suspended in the manner prescribed in applicable program requirements, when the department *1017 or agency head finds an institution has materially failed to comply with the terms of this policy.
(b) In making decisions about supporting or approving applications or proposals covered by this policy the department or agency head may take into account, in addition to all other eligibility requirements and program criteria, factors such as whether the applicant has been subject to a termination or suspension under paragraph (a) of this section and whether the applicant or the person or persons who would direct or has have directed the scientific and technical aspects of an activity has have, in the judgment of the department or agency head, materially failed to discharge responsibility for the protection of the rights and welfare of human subjects (whether or not the research was subject to federal regulation).
46.124 Conditions.
With respect to any research project or any class of research projects the department or agency head may impose additional conditions prior to or at the time of approval when in the judgment of the department or agency head additional conditions are necessary for the protection of human subjects.

Attachment B
[Code of Federal Regulations]
[Title 45, Volume 1]
[Revised as of October 1, 2003]
From the U.S. Government Printing Office via GPO Access
[CITE: 45CFR46.116]
[Page 117-119]

TITLE 45PUBLIC WELFARE AND HUMAN SERVICES
PART 46PROTECTION OF HUMAN SUBJECTSTable of Contents
Subpart ABasic HHS Policy for Protection of Human Research Subjects
Sec. 46.116 General requirements for informed consent.
Except as provided elsewhere in this policy, no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances
[[Page 118]]
that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence. The information that is given to the subject or the representative shall be in language understandable to the subject or the representative. No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal rights, or releases or appears to release the investigator, the sponsor, the institution or its agents from liability for negligence.
(a) Basic elements of informed consent. Except as provided in paragraph (c) or (d) of this section, in seeking informed consent the following information shall be provided to each subject:
(1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification *1018 of any procedures which are experimental;
(2) A description of any reasonably foreseeable risks or discomforts to the subject;
(3) A description of any benefits to the subject or to others which may reasonably be expected from the research;
(4) A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject;
(5) A statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained;
(6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained;
(7) An explanation of whom to contact for answers to pertinent questions about the research and research subjects' rights, and whom to contact in the event of a research-related injury to the subject; and
(8) A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled.
(b) Additional elements of informed consent. When appropriate, one or more of the following elements of information shall also be provided to each subject:
(1) A statement that the particular treatment or procedure may involve risks to the subject (or to the embryo or fetus, if the subject is or may become pregnant) which are currently unforeseeable;
(2) Anticipated circumstances under which the subject's participation may be terminated by the investigator without regard to the subject's consent;
(3) Any additional costs to the subject that may result from participation in the research;
(4) The consequences of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject;
(5) A statement that significant new findings developed during the course of the research which may relate to the subject's willingness to continue participation will be provided to the subject; and
(6) The approximate number of subjects involved in the study.
(c) An IRB may approve a consent procedure which does not include, or which alters, some or all of the elements of informed consent set forth above, or waive the requirement to obtain informed consent provided the IRB finds and documents that:
(1) The research or demonstration project is to be conducted by or subject to the approval of state or local government officials and is designed to study, evaluate, or otherwise examine; (i) Public benefit of service programs; (ii) procedures for obtaining benefits or services under those programs; (iii) possible changes in or alternatives to those programs or procedures; or (iv) possible changes in methods or levels of payment for benefits or services under those programs; and
[[Page 119]]
(2) The research could not practicably be carried out without the waiver or alteration.
(d) An IRB may approve a consent procedure which does not include, or which alters, some or all of the elements of informed consent set forth in this section, or *1019 waive the requirements to obtain informed consent provided the IRB finds and documents that:
(1) The research involves no more than minimal risk to the subjects;
(2) The waiver or alteration will not adversely affect the rights and welfare of the subjects;
(3) The research could not practicably be carried out without the waiver or alteration; and
(4) Whenever appropriate, the subjects will be provided with additional pertinent information after participation.
(e) The informed consent requirements in this policy are not intended to preempt any applicable federal, state, or local laws which require additional information to be disclosed in order for informed consent to be legally effective.
(f) Nothing in this policy is intended to limit the authority of a physician to provide emergency medical care, to the extent the physician is permitted to do so under applicable federal, state, or local law.
(Approved by the Office of Management and Budget under control number XXXX-XXXX)
NOTES
[1] The Court's factual findings are derived from the transcripts of the permanent injunction hearing (Vols. 1-3); the parties' exhibits, deposition testimony, and the parties' briefs. Where necessary, the Court will cite to specific evidence and/or testimony. Where more than one copy of the same exhibit has been filed by different parties, the Court will cite to only one exhibit; however, the reference should not be considered any indication of bias on the part of the Court. Referring to only one of duplicative (in some cases, triplicative) exhibits is simply a matter of judicial efficiency.
[2] Defendant Catalona is also a Counterclaim Plaintiff.
[3] genito-urinary
[4] Ward, McGurk, and Ellis testified at the hearing.
[5] In order for simplicity and judicial efficiency, the persons who contributed samples to the GU Biorepository are collectively referred to as "research participants" and include the eight (8) men who have been allowed to intervene in this case and refer to themselves as "patient/defendants".
[6] When citing to hearing testimony, the Court will use the following notation: "Tr" stands for transcript; the number following TR stands for Vol. 1, 2. or 3; and the number after the colon is the page number. Thus, the referenced testimony can be found in Vol.1 of the hearing transcript on page 46.
[7] Testimony and documents refer to the cancer research studies as "protocols", a term which the Court may use from time to time.
[8] Prior to 1999, this office was known as the Office for Protection from Research Risks (OPRR).
[9] See Attachment A-45 C.F.R. Part 46, Subpart A.
[10] To "anonymize" a sample, all links to the RP's personal identifying data is removed and the sample is no longer "linked" to a particular RP.
[11] It is undisputed by all the parties, and previously held by this Court, that Dr. Catalona has abandoned any legal argument as to his personal ownership of the subject biological materials.
[12] Plaintiff's Exhibit 17.
[13] Eg. Plaintiff's Exhibit 14  MTA dated June 1, 2001 between WU and the University of Cincinnati.
[14] Albeit Dr. Catalona testified that he felt he had no choice but to sign; yet still felt he had proprietary interest in the subject biological materials, the Court finds that the document speaks for itself.
[15] Dr. Catalona and the patients/defendants have cited several other cases which the Court has reviewed and finds inapplicable. These cases involved sperm donation, possession of a dead body, and tax liability for donated blood, among other issues. None of the cases cited by Dr. Catalona and/or the patients/defendants involved the donation of biological materials for medical research.
[16] For judicial economy and clarity, the Court will short cite to the California 3rd Reporter.
[17] Although not particularly relevant to the matter at hand, the Court does note that even Dr. Catalona, as a researcher at Northwestern University, testified that he is using informed consent forms which only state two (2) options upon a RP's decision to withdraw participation: 1) destruction of the sample or 2) anonymization of the sample. Northwestern University's consent form interestingly does not provide the third option advocated by Dr. Catalona and the RPs; i.e. return of the sample to the RP or transfer of the sample to a location chosen by the RP.
[18] Defendant's Exhibit I.
[19] Although it is not this Court's common practice to cite to unpublished opinions, it will do so in the rare instance wherein such opinion offers guidance helpful to this Court on a particular issue.
[20] Actually, Dr. Catalona and the RPs assert an "implied bailment". "A contract for bailment may be written, oral, express, or implied." D.S. Sifers Corp. v. Hallak, et. al., 46 S.W.3d 11, 16 (Mo.App.2001) quoting Stone v. Crown Diversified Indus. Corp., 9 S.W.3d 659, 669 (Mo.App.1999).
[21] Dr. Catalona's testimony was that out of approximately 40!000 research participants he had one or two who requested their samples back and the samples were processed and actually sent to a clinical laboratory (of the RP's choosing), not the RP's home. Tr. 2:16-17.
[22] Document # 106, filed April 6, 2006.
[23] Nothing in this opinion or the Court's ultimate findings shall be construed to prohibit Dr. William Catalona from seeking said samples through the ordinary and regular channels normally available to any medical researcher requesting approval of a research protocol from WU.
[1] Institutions with HHS-approved assurances on file will abide by provisions of title 45 CFR part 46 subparts A-D. Some of the other Departments and Agencies have incorporated all provisions of title 45 CFR part 46 into their policies and procedures as well. However, the exemptions at 45 CFR § 46.101(b) do not apply to research involving prisoners, fetuses, pregnant women, or human in vitro fertilization, subparts B and C. The exemption at 45 CFR § 46.101(b)(2), for research involving survey or interview procedures or observation of public behavior, does not apply to research with children, subpart D, except for research involving observations of public behavior when the investigator(s) do not participate in the activities being observed.